**Stephen M. FLATOW, Plaintiff,**

v.

**The ISLAMIC REPUBLIC OF IRAN, The Iranian Ministry of Information & Security, Ayatollah Ali Hoseinie Khamenei, Ali Akbar Hashemi–Rafsanjani, Ali Fallahian–Khuzestani, and John Does 1–99, Defendants.**

**Civil Action No. 97–396 (RCL).**

United States District Court, District of Columbia.

Dec. 10, 1999.

---

Steven R. Perles, Washington, DC, Thomas Fortune Fay, Washington, DC, for Plaintiff.

Vincent M. Garvey, Wilma Lewis, Frank W. Hunger, Phillip D. Bartz, John Niemeyer, Carol Federighi, Sanjay Bhambhani, U.S. Dept. of Justice, Civil Div., Washington, DC, for Defendants.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter concerns yet another attempt by Plaintiff Stephen Flatow to satisfy the judgment he obtained almost two years ago against the Islamic Republic of Iran ("Iran") for its sponsorship of the terrorist group that murdered his daughter. Pursuant to the Foreign Sovereign Immunities Act, he has levied writs of attachment upon three parcels of real estate owned by the Islamic Republic of Iran, including the former Iranian embassy, and two NationsBank accounts containing funds generated by the State Department's lease of these properties. 28 U.S.C.A. § 1610(a)(7) & 1610(f)(1)(A) (West Supp.1999). Once again, however, the United States has intervened to quash the writs of attachment,[1] contending that the properties and accounts are immune from attachment under the Foreign Missions Act, 22 U.S.C. §§ 4301–4316 (1999), the Foreign Sovereign Immunities Act, 28 U.S.C.A. §§ 1609 & 1610 (West Supp. 1999), the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1702 (1999), the Vienna Convention on Diplomatic Relations,[2] and Article II of the Constitution. U.S. CONST. ART. II, § 3, cl. 3 (granting the President the power "to receive Ambassadors and other public Ministers). Because the Court finds that these properties and accounts are immune from attachment under the Foreign Sovereign Immunities Act, the Court hereby GRANTS the United States' motion and the July 9, 1998 writs of attachment are hereby QUASHED. Thus, having found that plaintiff is barred from attaching the properties and accounts under the Foreign Sovereign Immunities Act, the Court need not determine whether their attachment under this Act would run afoul of the Constitution, the Foreign Missions Act, the International Emergency Economic Powers Act, or the Vienna Convention.

### I. BACKGROUND

In April 1995, the Shaqaqi faction of the Palestine Islamic Jihad, a group that is funded exclusively by the Islamic Republic of Iran ("Iran"), bombed a tourist bus in Gaza, killing Stephen Flatow's 20–year–old daughter Alisa. *See Flatow v. The Islamic Republic of Iran,* 999 F.Supp. 1, 6–9 (D.D.C.1998). One year later, utilizing a newly-enacted amendment to the Foreign

---

1. The United States appears pursuant to 28 U.S.C. § 517, which provides that the United States may appear in any court in the United States "to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

2. The Vienna Convention on Diplomatic Relations, T.I.A.S. 7502, 23 U.S.T. 3227 (1964).

Sovereign Immunities Act, Flatow filed a wrongful death action against Iran, its Ministry of Information & Security and various high-level government officials. *See Civil Liability for Acts of State Sponsored Terrorism,* Pub.L. No. 104–208, Div. A., Title I § 101(c) [Title V, § 589, 110 Stat. 3009–172], (30 September 1996) *reprinted at* 28 U.S.C.A. § 1605(a)(7) (West Supp.1999) (creating jurisdiction over claims against foreign entities who provide material support for acts of extrajudicial killing, *inter alia* ) (commonly called the "Flatow Amendment"); *see also Flatow,* 999 F.Supp. at 5. Iran failed to appear. Accordingly, this Court held an evidentiary hearing and determined that the plaintiff had "establishe[d] his claim or right to relief by evidence . . . satisfactory to the Court." 28 U.S.C.A. § 1608(e) (West Supp.1999); *Flatow,* 999 F.Supp. at 5. Based upon the evidence presented at this hearing, the Court entered a default judgment against Iran, finding Iran and the co-defendants jointly and severally liable for compensatory damages, loss of accretions, solatium and $225,000,000.00 in punitive damages. *Flatow,* 999 F.Supp. at 5. To date, Flatow's efforts to satisfy his judgment against Iran have proven unsuccessful. *See, e.g., Flatow v. Islamic Republic of Iran,* 74 F.Supp.2d 18, 20 (D.D.C. 1999) (quashing writ of attachment against U.S. Treasury funds); *Flatow v. Islamic Republic of Iran,* 67 F.Supp.2d 535, 537–38 (D.Md. 1999) (quashing writs of execution against non-profit foundation's property). In the instant matter, Flatow seeks to attach various parcels of real estate in Washington, D.C., belonging to Iran. Notably, these properties include the former Iranian embassy.[3] Flatow also seeks attachment of two NationsBank bank accounts, which are entitled "Blocked Iranian Diplomatic and Consular Property Renovation Account c/o Blocked Assets Administration, U.S. Department of Treasury" ("First Account") and "U.S. Department of State, Office of Foreign Missions, Iranian Renovation Account" ("Second Account"). The First Account comprises excess funds and interest generated from the leasing of these properties to third parties. The Second Account, which originally contained Iranian diplomatic and consular accounts, contains funds generated by the leases but used for maintenance and related expenses.

Despite its public proclamations of support for efforts[4] to bring state sponsors of terrorism to justice, the Clinton administration has intervened to forestall plaintiff Flatow's ability to satisfy his judgment. *See* Determination to Waive Requirements Relating to Blocked Property of Terrorist–List States, 63 Fed.Reg. 59201 (October 21, 1998) (exercising authority to waive requirements under § 117(d) and stating that such requirements "would impede the ability of the President to conduct foreign policy in the interest of national security");

---

3. These properties are 3003–3005 Massachusetts Ave., N.W., Washington, D.C. 20008 (the Iranian Embassy and Chancery and the Iranian Ambassador's residence until April 8, 1980, when the Department of State took custody); 3410 Garfield Street, N.W., Washington, D.C. 20008 (the residence of the Iranian military attache); and 2954 Upton Street, N.W., Washington, D.C. 20008 (the residence of the Iranian Minister of Cultural Affairs).

4. *See, e.g.,* Meet the Press (NBC Television Broadcast, November 7, 1999) (Interview with White House Chief of Staff John Podesta) (re-broadcasting February 26, 1996 videotape of President Clinton, where he stated "I am asking that Congress pass legislation that will provide immediate compensation to the families, something to which they are entitled under international law, out of Cuba's blocked assets here in the United States. If Congress passes this legislation, we can provide the compensation immediately."); *see also* President's Remarks on Signing the Antiterrorism and Effective Death Penalty Act of 1996, 32 Weekly Comp.Pres.Doc. 717 (April 24, 1996) (commenting that "[t]his bill strikes a mighty blow against terrorism, and it is fitting that this bill becomes law during National Crime Victim's Rights Week, because it stands up for victims in so many important ways" and concluding that "America will never abide terrorists . . . . [w]e will not rest until we have brought them all to justice").

*see also Flatow,* 74 F.Supp.2d at 20 (D.D.C. 1999). In this latest chapter in plaintiff's ongoing struggle to hold accountable those responsible for his daughter's murder, the United States contends, *inter alia,* that the Foreign Sovereign Immunities Act, the Foreign Missions Act, the International Emergency Economic Powers Act, the Vienna Convention on Diplomatic Relations and Article II of the Constitution bar the attachment of these properties and accounts. As explained below, because the Court finds that it lacks jurisdiction over the properties and accounts under the Foreign Sovereign Immunities Act, the Court need not reach the merits of the United States' other claims.[5]

## II. DISCUSSION

### A. *The Foreign Sovereign Immunities Act*

The enumerated exceptions to the Foreign Sovereign Immunities Act ("FSIA")

provide the exclusive source of subject matter jurisdiction over all civil actions against foreign states. *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434–35, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Accordingly, the FSIA must be applied in every action involving a foreign state defendant. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 489, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Unless one of the FSIA's exceptions applies, foreign states enjoy immunity from the jurisdiction of U.S. courts. 28 U.S.C.A. § 1604 (West 1999). Similarly, the property of a foreign state in the United States is immune from attachment or execution, unless an exception under sections 1610 or 1611 provides otherwise. 28 U.S.C.A. §§ 1610 & 1611 (West Supp. 1999). Section 1610 enumerates the general exceptions to immunity from attachment or execution, while Section 1611 specifies particular types of property that are immune from execution.

---

**5.** In response to the United States' contention that the Foreign Missions Act and the Vienna Convention operate as separate bars to these attachments, plaintiff asserts that the more recently enacted amendments to the FSIA abrogate the scope of these laws. *See* 28 U.S.C.A. § 1610(f)(1)(A) (providing for attachment of properties "notwithstanding any other provision of law" including Section 4308(f) of the Foreign Missions Act); *see also* NORMAN J. SINGER, 1A SUTHERLAND ON STATUTORY CONSTRUCTION §§ 22.22, 22.34 (5th ed. 1995 & Supp.1997). *But see* 28 U.S.C.A. § 1609 ("Subject to existing international agreements to which the United States is a party at the time of enactment ... the property in the United States of a foreign state shall be immune from attachment, arrest and execution...."). Without deciding the extent to which the recent FSIA amendments amend the Foreign Missions Act or the Vienna Convention, the Court wishes to note another subsection, one not addressed by the parties, that should be considered in determining whether the FSIA implicitly repeals portions of the Foreign Missions Act. *See* 28 U.S.C.A. § 1610(a)(4)(B) (West 1999) (providing exception to immunity for judgments establishing rights in immovable property, "[p]rovided, [t]hat such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such

mission"). Notably, Section 1610(a)(4)(B) specifically reserves immunity for mission property where such property provides the basis for the judgment. By its plain terms, this provision appears to evince Congress' intent to render mission property immune from attachment under the FSIA, at least where such property provides the basis for the judgment. Such a reading may be further supported by reference to Section 1610(b)(2), which authorizes attachment and execution of certain types of judgments against foreign state agents or instrumentalities, but does not include the provision that governs actions involving real property, Section 1605(a)(4). *See* 28 U.S.C.A. § 1610(b)(2) (authorizing attachments of foreign state agent property that is not immune under section 1605(a)(2), (3), (5), or (7)). Alternatively, the absence of a similar restriction against attaching mission property in the provision covering judgments against state-sponsors of terrorism could also demonstrate Congress' intent to provide for maximum enforcement against terrorist-list nations, including attachment of mission property. *See* 28 U.S.C.A. § 1610(a)(7) (providing that judgments obtained pursuant to the state-sponsored terrorism exception may be enforced against property *"regardless of whether the property is or was involved with the act upon which the claim is based"*) (emphasis added).

## B. *Attachment under Section 1610(a)(7)*

Plaintiff contends that Section 1610(a)(7) of the FSIA authorizes the attachments here because the properties and accounts are "used for commercial activity" within the meaning of the FSIA and the judgment he seeks to enforce was awarded under Section 1605(a)(7), the state-sponsored terrorism exception. The United States does not contest the source of the judgment. Rather, the United States asserts that the property and accounts at issue do not meet the threshold requirement of the exception, *i.e.*, that the property is "used for commercial activity in the United States." 28 U.S.C.A. § 1610(a)(7). Plaintiff maintains that the critical inquiry regarding commercial use is the nature of the activity, not its purpose and that the identity of the commercial actor is immaterial to the inquiry. Thus, he characterizes these properties and accounts as commercial in nature because the United States' leasing of the properties is not an inherently sovereign action, but one that may be undertaken by a private actor. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (concluding that, for purposes of the FSIA's "commercial activity" exception, "when a foreign government acts, not as regulator of a market but in the manner of a private player within it," the activities are commercial).

While agreeing that the nature of the activity governs "commercial activity" analysis, *see* 28 U.S.C.A. § 1603(d); *see also Weltover*, 504 U.S. at 614, 112 S.Ct. 2160, the United States asserts that, for purposes of the FSIA, only the foreign state's actions are relevant, not those of the United States. The United States points out that Iran opposes the leases of its properties. *See Islamic Republic of Iran v. United States*, Case Nos. A4/A7/A5 (I:F and III); Dec. 129–A4/A7/A15–FT, at 1–2 (June 23, 1997, Iran–United States Claims Tribunal) (denying Iran's request to have leases terminated and noting that leases were "in order to prevent [the properties] falling into an irreversible state of disrepair"). In the alternative, the government argues that, even if a foreign state's actions are not critical to the applicability of this provision, the actions undertaken by the United States in this matter are sovereign, not commercial, in nature. That is, the government contends that the United States, through the State Department's Office of Foreign Missions, is acting in its sovereign capacity by taking custody of and leasing these properties pursuant to its "preserve and protect" responsibilities under the Foreign Missions Act, as well as discharging its duties under the Vienna Convention. *See* Foreign Missions Act, 22 U.S.C. § 4305(c) (providing that "[i]f a foreign mission has ceased conducting diplomatic, consular and other governmental activities in the United States, and has not designated a protecting power or other agent ... the Secretary, until the designation of a protecting power or other agent ... may preserve and protect any property of that foreign mission"); *see also* Vienna Convention on Diplomatic Relations, Article 45(a), T.I.A.S. 7502, 23 U.S.T. 3227 (1964) (providing that "[i]f diplomatic relations are broken off between two states ... (a) the receiving state must, even in the case of armed conflict, respect and protect the premises of the mission, together with its property and archives").

To address whether these properties and accounts are "used for commercial activity" for purposes of Section 1610(a)(7), the Court begins with the statutory language. Section 1610(a)(7) provides that

[t]he property in the United States of a foreign state ... used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution upon a judgment entered by a court of the United States ... if

the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was in-

volved with the act upon which the claim is based.

28 U.S.C.A. § 1610(a)(7). By its terms, the threshold requirement for invoking this provision is that the property is "used for commercial activity in the United States." "Commercial activity" is defined in two instances under the FSIA. First, the statute generally defines "commercial activity" as

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C.A. § 1603(d) (West 1999). The FSIA also provides a second, more specific definition, termed "commercial activity carried on in the United States by a foreign state," 28 U.S.C.A. § 1603(e) (West 1999), which is defined as "commercial activity carried on by such state and having substantial contact with the United States." *Id.* This more specific definition relates to language found in one of the FSIA's enumerated exceptions to jurisdictional immunity. *See* 28 U.S.C.A. § 1605(a)(2) (abrogating foreign state immunity in actions "based upon a commercial activity carried on in the United States by the foreign state").

The Supreme Court has addressed the meaning of "commercial activity" under the FSIA, albeit in the context of the so-called "commercial activity exception," one of the Act's enumerated exceptions to jurisdictional immunity. 28 U.S.C.A. § 1605(a)(2) (West 1999). *See Republic of Argentina v. Weltover,* 504 U.S. 607, 611–14, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). While the precise provision at issue in *Republic of Argentina v. Weltover* is not implicated here, the Supreme Court's construction of the proper scope and meaning of "commercial activity" under the FSIA guides this Court's analysis. In *Weltover,* the Supreme Court determined that Ar-

gentina's default on certain currency stabilization bonds constituted an act "in connection with a commercial activity" that "had a direct effect in the United States" sufficient to subject Argentina to suit in the United States under the FSIA. 28 U.S.C.A. § 1605(a)(2). The Court began its analysis by noting that the definition of commercial activity provided in the FSIA "leaves the critical term 'commercial' largely undefined." *Weltover,* 504 U.S. at 612, 112 S.Ct. 2160. Drawing upon the historical background of the FSIA, however, the Court noted that the statute "largely codifie[d] the so-called 'restrictive' theory of foreign sovereign immunity," which distinguished actions "arising out of purely commercial transactions," *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 703, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) from those deriving from "powers peculiar to sovereigns." *Id.* at 704, 96 S.Ct. 1854. Thus, the Court instructed that "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are commercial within the meaning of the FSIA." *Weltover,* 504 U.S. at 614, 112 S.Ct. 2160 (emphasis added). Thus, to determine whether a foreign state's actions are commercial, courts must examine "whether the particular *actions* that the foreign state performs (whatever the motive behind them) are the types of actions by which a private party engages in trade and traffic or commerce." *Id.* (citing Black's Law Dictionary 270 (6th ed.1990)) (emphasis added).

### 1. Real Property

The parties in the instant matter do not dispute that Iran's prior use of the real estate was sovereign in nature, not commercial. Prior to suspending diplomatic relations, the embassy and residences were used to support Iran's diplomatic activities in the United States, an inherently sovereign activity. *See, e.g., S & S Machinery Co. v. Masinexportimport,* 802 F.Supp. 1109, 1111–12 (S.D.N.Y.1992)

(mission buildings are not used for commercial activity and do not fall within FSIA exception to immunity); *City of Englewood v. Socialist People's Libyan Arab Jamahiriya*, 773 F.2d 31, 36–37 (3d Cir. 1985) (stating that use of property as diplomatic residence "as a matter of law ... is not commercial activity"); *United States v. Arlington County*, 702 F.2d 485, 488 (4th Cir.1983); *United States v. Arlington County*, 669 F.2d 925, 934–35 (4th Cir.1982) (concluding that FSIA affords immunity to foreign state's apartment building that is used to house diplomatic personnel). As such, Iran's prior use of the properties does not render them commercial for purposes of the FSIA.

■ Plaintiff and the United States disagree as to whether the foreign state's use of the property for commercial activity is necessary for Section 1610(a)(7) to apply. Secondarily, they dispute whether the United States' custody over and leasing of the properties is sovereign or commercial in nature. This Court agrees with the United States that the provision's applicability turns on the foreign state's actions with respect to commercial use. Not only does the Supreme Court's interpretation of "commercial activity" in *Weltover* specifically refer to the foreign state's actions, *see Weltover*, 504 U.S. at 614, 112 S.Ct. 2160 (stating that "when *a foreign government acts*, not as a regulator of a market, but in the manner of a private player within it, the *foreign sovereign's actions* are commercial within the meaning of the FSIA") (emphasis added); *see also id.* (stating that "whether the particular *actions that the foreign state performs* (whatever the motive behind them) are the types of actions by which a private party engages in trade and traffic or commerce") (emphasis added), but practicality dictates such a finding. Among its purposes, the FSIA was designed to subject foreign states to the laws of the United States when they choose to engage in private commercial activity. *See Dunhill*, 425 U.S. at 704, 96 S.Ct. 1854. To effectuate

this purpose, the statute creates various narrow windows of federal jurisdiction over foreign states. 28 U.S.C.A. §§ 1605 & 1610. But if the FSIA could be applied to foreign state property that is being used by a non-agent third party, it would expand the class of cases arising under the Act beyond those limited, enumerated exceptions to immunity prescribed by Congress, and thus would expose foreign states to far greater liability than was originally contemplated under the Act. 28 U.S.C.A. §§ 1605 & 1610.

■ Alternatively, even if foreign state action were not critical to the applicability of the "commercial activity" attachment exception, the United States' taking custody over a foreign state's properties and maintaining them is an inherently sovereign, not a commercial act. Specifically, the United States, acting through the Office of Foreign Missions, took custody over the properties pursuant to its "preserve and protect" responsibilities under the Foreign Missions Act. *See* Foreign Missions Act, 22 U.S.C. § 4305(c) (providing that "[i]f a foreign mission has ceased conducting diplomatic, consular and other governmental activities in the United States, and has not designated a protecting power or other agent ... the Secretary, until the designation of a protecting power or other agent ... may preserve and protect any property of that foreign mission"). Put simply, although leasing of property by a private party might be commercial in nature, taking custody over diplomatic property under the authority granted by a federal statute or treaty is decidedly sovereign in nature. Indeed, such "power[ ][is] peculiar to sovereigns." *See Dunhill*, 425 U.S. at 703, 96 S.Ct. 1854. Accordingly, because the Court finds that the real properties at issue do not fall within the definition of commercial activity under the FSIA, the writ of attachment may not be enforced against such properties.

### 2. Bank Accounts

■ The NationsBank accounts are also immune from attachment, albeit for somewhat different reasons. To begin with, the Court finds that the Second Account does not constitute "property used for commercial activity" for purposes of Section 1610(a)(7). Rather, the Second Account was licensed by the Treasury Department to the Office of Foreign Missions for the payment of maintenance and repair expenses relating to the real estate. As outlined above, the United States' preservation and protection of the properties under the Foreign Missions Act is a sovereign act. Because these funds were specifically licensed to the Office of Foreign Missions to enable them to fulfill the United States' statutory responsibilities, their use is more properly characterized as sovereign than commercial.

Alternatively, another factor weighs against enforcing the attachment against these funds under the "commercial activity" attachment exception of the FSIA. Significantly, the Second Account originally contained Iranian diplomatic assets and was licensed to the Office of Foreign Missions by the Office of Foreign Assets Control. It is therefore regulated by the International Emergency Economic Powers Act and the Iranian Assets Control Regulations. As such, if the President had not exercised his authority to waive its requirements, *see infra*, the plain terms of Section 1610(f)(1)(A) appear to cover this account. 28 U.S.C.A. § 1610(f)(1)(A) (authorizing attachment of property in which financial transactions are prohibited or regulated by, *inter alia*, the International Emergency Economic Powers Act or its regulations). Thus, if this Court were to construe Section 1610(a)(7) to permit the attachment of blocked Iranian accounts, this interpretation would render Section 1610(f)(1)(A) superfluous. Instead, the Court finds it unlikely that Congress enacted two separate provisions of the same statute in order to achieve the same result. That is, if blocked accounts were already subject to attachment under Section 1610(a)(7), Congress would have had no need to enact an entirely new provision, Section 1610(f)(1)(A), to authorize the attachment of these very same funds.

■ Different considerations compel this Court to find that the funds in the First Account are not subject to attachment. As noted above, the First Account contains the profits, and any interest thereon, generated by the leases of the diplomatic property. And, unlike the Second Account, the United States does not contend that this account contains any funds that were initially held in Iranian diplomatic accounts. Rather, the United States advances, *inter alia*, that the First Account may not be attached because it constitutes Iranian property that is "blocked" and regulated by the Iranian Assets Control Regulations. 31 C.F.R. § 535.201. This Court disagrees with the United States' characterization of this account as Iranian property. Instead, the Court finds that the First Account is more properly characterized as United States property, which is immune from attachment by virtue of the doctrine of sovereign immunity. *See Buchanan v. Alexander*, 45 U.S. (4 How.) 20, 21, 11 L.Ed. 857 (1846); *Federal Housing Admin. v. Burr*, 309 U.S. 242, 243, 60 S.Ct. 488, 84 L.Ed. 724 (1940); *see also Neukirchen v. Wood County Head Start, Inc.*, 53 F.3d 809, 811 (7th Cir.1995); *Automatic Sprinkler Corp. v. Darla Environmental Specialists*, 53 F.3d 181, 182 (7th Cir.1995); *State of Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C.Cir.1991); *Haskins Bros. & Co. v. Morgenthau*, 85 F.2d 677, 681 (App.D.C. 1936); *Flatow*, 74 F.Supp.2d at 20. Specifically, the Secretary of State, exercising discretion delegated by the Foreign Missions Act, 22 U.S.C. § 4305(c), elected to lease these properties to generate revenue for required repairs and maintenance. If the United States had not leased these properties, repairs and maintenance would still have to have been funded by the Unit-

ed States, most likely from tax revenues in the Treasury. Moreover, Iran opposed these leases from their inception. To designate the leased profits as Iranian property, when Iran would not otherwise have accrued these monies, accords Iran an undeserved windfall. Accordingly, because the funds in the First Account do not constitute Iranian property, they are not subject to the Iranian Assets Control Regulations. Nor does any provision of the FSIA apply to such funds. *See Flatow,* 74 F.Supp.2d at 20–24. Rather, as this Court has explained previously, *see id.,* because the funds in the First Account constitute United States property, sovereign immunity bars their attachment, absent an express waiver of consent. *Cf. Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255, 119 S.Ct. 687, 692, 142 L.Ed.2d 718 (1999) (Rehnquist, C.J.) (stating that it "is in accord with our precedent establishing that sovereign immunity bars creditors from attaching or garnishing funds in the Treasury").

### C. *Attachment Under Section 1610(f)(1)(A)*

Alternatively, plaintiff advances that a second FSIA provision, Section 1610(f)(1)(A), authorizes the attachment of the properties and accounts because its plain terms cover the properties at issue. Section § 1610(f)(1)(A) provides

> Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. § 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. § 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701–1702), or any other proclamation, order, regulation, or license issued

pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section 1605(a)(7).

28 U.S.C.A. § 1610(f)(1)(A) (West Supp. 1999). Specifically, plaintiff asserts that this provision is applicable because the property and accounts are regulated by the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–02, and the Iranian Assets Control Regulations, which define property to

> include, but not by way of limitation, money, checks, drafts, bullion, *bank deposits, savings accounts,* debts, indebtedness, ... any other evidences of title, ownership or indebtedness, ... judgments, ... and *any other property, real,* personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent.

31 C.F.R. § 535.311 (1999) (emphasis added).

While conceding that its plain terms may cover the properties and accounts at issue, the United States asserts that this section is unavailable to the plaintiff because the President has "waive[d] the requirements of this section in the interest of national security." *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub.L. 105–277, Title I, § 117, 112 Stat. 2681 (October 21, 1998) ("Section 117") (adding subsections 1610(f)(1)(A) & (B) and providing that "[t]he President may waive the requirements of this section in the interest of national security"); *see also* Determination to Waive Requirements Relating to Blocked Property of Terrorist–List States, 63 Fed.Reg. 59201 (October 21, 1998) (exercising authority to waive requirements under § 117(d) and stating that such requirements "would impede the ability of the President to conduct foreign policy in the interest of national security"). The United States maintains that the waiver

provision, Section 117(d), covers both paragraphs of FSIA Section 1610(f).

Plaintiff opposes this construction and contends Section 117(d) does not extend to Section 1610(f)(1). Instead, he maintains that Section 117(d) only applies to Section 1610(f)(2) because that provision requires the Secretary of the Treasury and the Secretary of State to provide assistance in locating assets. 28 U.S.C.A. § 1610(f)(2)(A) (West 1999). In short, plaintiff reasons that the national security waiver provision only applies to Section 1610(f)(2) because it is the only provision of Section 117 that imposes "requirements" *per se*. To support this construction, plaintiff urges the Court to look past the statutory text to the legislative history to the amendment.

Whether Section 1610(f)(1)(A) authorizes these attachments turns on a determination of the proper scope of the President's waiver authority under Section 117(d). Having examined the statutory text, in the context of both Section 117 and the FSIA, the Court concludes that plaintiff's construction of Section 117(d) is refuted by the plain language of the statute. As such, this Court declines to accept plaintiff's invitation to delve into unreliable legislative history in search of a different meaning. *Cf. Public Citizen v. United States Dept. of Justice*, 491 U.S. 440, 472, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J. concurring) ("Where it is clear that the unambiguous language of a statute embraces certain conduct, and it would not be patently absurd to apply the statute to such conduct, it does not foster a democratic exegesis for this Court to rummage through unauthoritative materials to consult the spirit of the legislation in order to discover an alternative interpretation of the statute with which the Court is more comfortable.)". Moreover, contrary to plaintiff's protest that giving full effect to the waiver provision produces an absurd—

and hence unsanctionable—result, this Court finds that construing the waiver to cover both paragraphs of Section 1610(f) does not create a patently absurd result. Rather, given the deference traditionally afforded the President in the oft-sensitive area of foreign relations, *see, e.g., Regan v. Wald,* 468 U.S. 222, 242, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984), Congress' enactment of a waiver provision to counterbalance its enactment of a broad-reaching enforcement provision appears entirely reasonable.

The FSIA amendments at issue here were enacted as part of an end-of-the-year appropriations package. *See* Treasury and General Government Appropriations Act, 1999, *as contained in* Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub.L. No. 105–277, § 101(h), Title I, § 117(a)–(d) (October 21, 1998). Specifically, section 117(a) of the Appropriations Act amended Section 1610 of the Foreign Sovereign Immunities Act by adding subsection (f), which authorizes attachment and execution in aid of judgments obtained against state sponsors of terrorism. 28 U.S.C.A. § 1610(f)(1)(A). Section 117(d) amended the same statute to provide for a Presidential waiver in the interest of national security.[6] *See* Waiver of Exception to Immunity from Attachment or Execution, Pub.L. 105–277, Title I, § 117(d), 112 Stat. 2681 (October 21, 1998) (stating that "[t]he President may waive the requirements of this section . . . in the interest of national security"); *see also* Historical and Statutory Notes, 28 U.S.C.A. § 1610 (West Supp.1999).

Contrary to plaintiff's assertions that "requirements" refers only to Section 1610(f)(2), the Court finds the language and structure of the amendment dictates a finding that the waiver applies to the entire Section 1610(f). First, the plain language of Section 1610(f)(1) imposes certain requirements, to wit, that certain regulat-

---

6. Section 117(b) was a conforming amendment inserting text into Section 1606 of the FSIA, while Section 117(c) prescribed the ef-

fective date for the amendments. *See* Pub.L. No. 105–277, § 101(h), Title I, § 117(b) & (c) (October 21, 1998).

ed properties *"shall"* be subject to execution or attachment.... 28 U.S.C.A. § 1610(f)(1); *see also Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 118 S.Ct. 956, 961, 140 L.Ed.2d 62 (1998) (noting that " 'shall' ... normally creates an obligation impervious to judicial discretion"). Moreover, nothing else in the waiver provision counsels in favor of giving its language the unobvious construction plaintiff advances. Quite the contrary, the Court finds that the language "this section" plainly covers the entire Section 1610(f), and not just the second paragraph. Indeed, from a structural standpoint, if the waiver provision were intended to be restricted only to Section 1610(f)(2), it would more likely have appeared as an exception to that subsection, rather than as a separate provision altogether. In conclusion, because the statutory text does not bear out the construction plaintiff advances, the Court finds that the waiver provision applies to both Section 1610(f)(1) and 1610(f)(2). Moreover, as Congress' delegation to the President in this instance is clear, the President has properly exercised his authority to waive Section 1610(f). *See Dames & Moore v. Regan,* 453 U.S. 654, 657, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (stating that "[w]hen the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress" and that "[t]hat in such a case, the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it' "). Accordingly, Section 1610(f)(1) is without operative effect and cannot authorize the attachments plaintiff seeks.

### 4. *Attachment under Section 1610(b)(2)*

█ Plaintiff also references Section 1610(b)(2) in support of the writs of attachment. Section 1610(b)(2) provides that any property in the United States of an *agency or instrumentality* of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State ..., if

> the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), (5), or (7) or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based.

28 U.S.C.A. § 1610(b)(2) (West 1999) (emphasis added). Put simply, this provision does not apply in the instant case. Critically, the assets in question belong to Iran, not an agent or instrumentality of Iran. Moreover, if Section 1610(b)(2) were construed to apply to foreign states, as well as their agents or instrumentalities, there would be no need for Section 1610(a)(7), which specifically refers to foreign states. Lastly, plaintiff does not maintain that the United States is acting as Iran's agent with respect to these properties, particularly in light of the fact that Iran opposes the lease of these properties. *See Islamic Republic of Iran v. United States,* Case Nos. A4/A7/A5 (I:F and III); Dec. 129–A4/A7/A15–FT, at 1–2 (June 23, 1997, Iran–United States Claims Tribunal). Accordingly, to the extent that plaintiff claims authority for the attachments under Section 1610(b)(2), the Court finds such assertions to be without merit.

### III. CONCLUSION

As this Court has noted previously, *see Flatow,* 74 F.Supp.2d at 25, the Court regrets that plaintiff's efforts to satisfy his judgment against Iran have proven futile. Indeed, in light of his lack of success thus far, it appears that plaintiff Flatow's original judgment against Iran has come to epitomize the phrase "Pyrrhic victory." Yet, unless or until Congress decides to enact a law that authorizes the attach-

ments plaintiff seeks, this Court lacks the proper means to assist him with such endeavors. *See, e.g.,* Bill to Modify the Enforcement of Certain Anti–Terrorism Judgments, and For Other Purposes, S.1796, § 1(3)(A), 106th Cong. (1999) (proposed but rejected bill that would have amended Section 1610(f) of the FSIA to permit, *inter alia,* the attachment of foreign mission property used for nondiplomatic purposes such as rental property, as well as any rental proceeds).

A separate order shall issue this date.