United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 29, 2002**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

—————

No. 01-50409

—————

CONNECTICUT BANK OF COMMERCE,

Plaintiff - Appellant-Cross-Appellee,

versus

THE REPUBLIC OF CONGO,

Defendant - Appellee

and

CMS OIL AND GAS COMPANY; CMS OIL AND GAS (INTERNATIONAL) COMPANY; CMS NOMECO INTERNATIONAL CONGO HOLDINGS, INC; CMS NOMECO CONGO, INC; CMS OIL AND GAS (HOLDINGS), LTD; CMS OIL AND GAS (INTERNATIONAL) LTD; CMS NOMECO CONGO LDC; CMS OIL AND GAS (CONGO) LTD; NUEVO ENERGY COMPANY; THE CONGO HOLDING COMPANY; THE NUEVO CONGO COMPANY; NUEVO CONGO LTD; NUEVO INTERNATIONAL, INC; NUEVO INTERNATIONAL HOLDINGS LTD

Garnishees - Appellees-Cross-Appellants.

---

Appeals from the United States District Court
for the Western District of Texas

---

ON PETITION FOR PANEL REHEARING

Before EMILIO M. GARZA, PARKER, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The motion of amicus curiae, Emerging Markets Creditors Association, Inc., to file a brief

in support of the Connecticut Bank of Commerce's ("the Bank's") petition for rehearing en banc is

GRANTED. Treating the Bank's petition for rehearing en banc as a petition for panel rehearing, the petition for panel rehearing is GRANTED in part. *See I.O.P. following* FED. R. APP. P. 35. We clarify the panel opinion, dated July 17, 2002, by withdrawing paragraph 25 and substituting for that paragraph the following Parts III - VI. In all other respects, the petition for panel rehearing is DENIED:

### III

In its petition for rehearing, the Bank advances an interpretation of "used for" that conflicts with the plain meaning of that phrase. The Bank contends that property is "used for" a commercial activity in the United States whenever it is "integral to" or "related to" a commercial activity located here. The Bank relies on a sentence from Judge Dennis's separate opinion: "Because the . . . royalties to the Congo *were necessary and integral to, and therefore used for*, the joint venture . . . those royalty obligations fell within the exceptions to immunity from execution provided for by FSIA § 1610(a)(1)" (emphasis added). In our view, this sentence is a non sequitur. The phrase "used for" on its face denotes something different and more specific than the phrases "integral to" or "necessary to." It also denotes something distinct (and narrower) than the other phrases the Bank uses in its petition, such as "related to" or "contemplated by."

The dictionary defines "to use" differently from any of these phrases. It defines "use," as relevant here, to mean: "to carry out a purpose or action by means of : make instrumental to an end or process . . . UTILIZE." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2524 (Philip B. Gove ed., Merriam Webster Inc. 1993) (1961). To use property for a commercial activity, within the ordinary meaning of "use," would be to put the property in the service of the commercial activity, to carry out the activity by means of the property. Here, the royalty obligations in question represent

-2-

the *revenue*, the *income*, from an allegedly commercial activity. In ordinary usage, we would not say that the revenue from a transaction is "used for" that transaction. For example, in return for an employee's service to his employer, he generally receives revenue in the form of a salary. It would be strange to say that "The employee uses his salary for his job." He *earns* his salary from his job, but he *uses* it to pay the rent, buy groceries, and so forth. The revenue from a commercial transaction does not have the instrumental relationship to the commercial activity denoted by the phrase "used for;" it is not put in service of that activity, instead it is the end result or income from the activity.

The phrases "integral to" and "related to" plainly mean something different. These are broad phrases that would allow execution on the basis of just about any connection with a commercial activity. The statute specifies a particular kind of relationship, a "used for" relationship. If Congress had intended any relationship to suffice, we would not expect for it to have used the narrower "used for" language.

Furthermore, the structure of the FSIA indicates that the phrase "used for" was intended to have a more specific meaning than what the Bank suggests: if we were to interpret § 1610(a) in the way suggested by the petition, we would have to interpret away an obvious difference in the phrasing of two different parts of the FSIA. The FSIA deals separately with immunity from jurisdiction (§ 1605) and immunity from execution (§ 1610). Although each of these sections creates a "commercial activity" exception from immunity, Congress phrased the two "commercial activity" exceptions very differently. Section 1605(a)(2), concerning immunity from jurisdiction, provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . .
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States *in connection with a commercial activity* of the foreign state elsewhere; or upon an act outside the territory of the

United States *in connection with a commercial activity of the foreign state* elsewhere and that act causes a direct effect in the United States;

This section uses the phrase "in connection with" a commercial activity. It allows a plaintiff to pierce a foreign state's immunity for suits based on acts that have any connection with a commercial activity in the United States (or with a commercial activity elsewhere that causes a direct effect in the United States). This phrase, "in connection with," means something like "related to" or "integral to." That is, the phrasing in the immunity section means much the same thing that the Bank wants to assign to the phrasing in the execution section.

Section 1610(a), concerning immunity from execution, does not use the phrase "in connection with." If Congress had intended to allow execution on property that had a "relationship with" or was "integral to" a commercial transaction in the United States, we would expect it to say as much, probably by using the same phrase ("in connection with") as it used in crafting the exception to jurisdictional immunity. Instead, § 1610(a) provides:

> (a) The *property in the United States* of a foreign state, as defined in section 1603(a) of this chapter, *used for a commercial activity in the United States*, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if [one of several additional factors applies].

Congress used the more specific phrase "used for a commercial activity" in this section rather than the less specific phrase "in connection with a commercial activity" used in § 1605. If we were to take the Bank's approach, we would interpret away the difference in phrasing between these two sections: the Bank is asking us to ignore an obvious difference in the way these two different immunities have been crafted.

As we previously observed, 2002 WL 1573488, at *5-6, the difference in phrasing between

the two "commercial activity" sections stands out especially starkly when viewed against the background of the historical and international law context of the FSIA. Historically, even under the "restrictive" theory of sovereign immunity, foreign sovereigns have enjoyed complete immunity from execution of their property in United States courts. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). Moreover, at the time the FSIA was passed, the international community viewed execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action. The Second Circuit's decision in *De Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984), relied on the international law context of the FSIA in concluding that the FSIA's exceptions to executional immunity were indeed narrower than its exceptions to jurisdictional immunity. The court relied on two principle sources of international law: the European Convention on State Immunity and the British State Immunity Act. The FSIA and the two European laws were all passed at roughly the same time: the European Convention in 1972, the FSIA in 1976, and the British State Immunity Act in 1978. *Id.* The European Convention did not provide *any* mechanism by which a litigant could execute against a foreign state's property: a judgment creditor had to obtain satisfaction through the foreign state's executive or administrative channels. *Id.*

The British State Immunity Act's provision on immunity from execution more closely parallels the FSIA's: it focuses plainly on the "use" of the property. The Act provides:

> (2)(b) the property of a State shall not be subject to any process for the enforcement of a judgment or arbitration award or, in an action in rem, for its arrest, detention or sale.
> . . .
> (4) Subsection (2)(b) above does not prevent the issue of any process in respect of property which is *for the time being in use or intended for use for commercial purposes* . . .

State Immunity Act 1978, c. 33, § 13 (Eng.). The British Act's phrasing makes explicit that the mere

relationship to a commercial activity does not suffice to permit execution, the property must presently, "for the time being," be "in use or intended for use for a commercial purpose." The British Act's focus in the jurisdictional immunity section, by contrast, is on the "relationship" to commercial activity:

> A State is not immune as respects proceedings *relating to*--
> (a) a commercial transaction entered into by the State

State Immunity Act 1978, c. 33, § 3 (Eng.). Thus, the British Act parallels the FSIA: it allows jurisdiction based on mere relationship to a commercial activity, but very clearly permits execution only depending on the "use" of the property.

On the face of the FSIA, the exception to executional immunity is crafted using the more specific "used for" language instead of the broader "in connection with" language. When we place this difference in phrasing against the background of the history of the two forms of immunity in the United States and the international law context of the FSIA, the difference in phrasing stands out even more plainly. We reject the Bank's definition, not only because it does not accord with the plain meaning of the phrase "used for,"[1] but because it would obscure a clearly intentional difference in the way the two different "commercial activity" exceptions from immunity))executional and

---

[1]Even the Bank appears to recognize that what matters under the statute is how the *foreign state* uses the property, not how private parties may have used the property in the past. *See Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16, 21-23 (D.D.C. 1999) (holding that the foreign state's use of the property for commercial activity is necessary for § 1610(a) to apply). Any property the foreign state purchases from a private supplier will necessarily be used for a commercial purpose by that supplier. If a foreign state buys real estate to use for an embassy, for example, the real estate will have been used for a commercial purpose by its former owner. Similarly, an embassy's telephones, cars, and diplomatic housing were all used by some private part y at some point for a commercial transaction; that is, the sale to the foreign state. If we were to allow a private party's commercial use of the property to count for § 1610(a), we would erase the commercial/noncommercial use distinction for almost all of a foreign state's tangible property.

jurisdictional) ) have been phrased by Congress.[2]

## IV

Contrary to the Bank's suggestion, assigning the phrase "used for" its ordinary meaning does not make it impossible to execute against the intangible property of the foreign state. The Bank argues that we have improperly assigned a temporal focus to the phrase "used for," that we have focused on the intended use of the property in the future instead of its use in the present or the past. The Bank suggests that, because it is difficult to prove what a foreign state intends to do in the future with intangible property, like bank accounts,[3] judgment creditors will rarely be able to execute against any intangible property.

We clarify that we express no holding as to the temporal aspect of the phrase "used for." In

---

[2]We also reiterate that assigning the phrase "used for" its plain meaning helps accomplish one of the principal goals of the FSIA: to restrain as much as possible judicial interference with the *jus imperii*, or sovereign acts, of a foreign state. *See* H.R. REP. 94-1487, at 7. Its true that allowing any kind of execution against a foreign state's property will likely have some indirect effect on the state's sovereign acts. If, for example, you execute against the commercially used property of a foreign state's national airline, you will probably damage the profits of the airline. The loss of those profits may, down the line, make it more difficult for the sovereign to supply books to its schoolchildren or send its officials abroad on diplomatic missions. But the impact of a court confiscating some property being used at present for a sovereign purpose is much more direct and immediate: for example, the attachment of a bank account used to pay diplomatic salaries or maintain an embassy would immediately and directly affect the foreign state's sovereign diplomatic activities.

[3]In considering execution against bank accounts, several district court cases have in fact focused on the use of those accounts, not on the source of the money in the account. For example, in *Liberian Eastern Timber Corp. v. Republic of Liberia*, 659 F. Supp. 606 (D.D.C. 1987), the District Court for the District of Columbia held that bank accounts "utilized for the maintenance of the full facilities of Liberia to perform its diplomatic and consular functions . . . including payment of salaries and wages of diplomatic personnel and various ongoing expenses incurred in connection with diplomatic and consular activities" were not "used for" a commercial activity within the meaning of the FSIA. The focus was plainly on how the money from the accounts was spent, not where it came from. Other district court cases have employed similar reasoning. *See Flatow,* 76 F. Supp. 2d at 24 (holding that bank accounts used for the repair and maintenance of noncommercial real estate were not used for a commercial activity and therefore were immune from attachment).

-7-

its petition for rehearing, the Bank does not allege any scenario under which the Congo has put its royalty or tax obligations at any point in time in the service of a commercial activity in the United States. That is, it does not claim that the Congo used the property for a commercial activity, within the ordinary meaning of "used for," at any time. Instead, it wants us to interpret the phrase "used for" in a way that goes beyond the ordinary meaning assigned to that phrase. Because the temporal aspect of the phrase "used for" does not seem particularly important to resolving this case on any of the Bank's current theories, we express no opinion on *when* the property must be used for a commercial activity in the United States.

Moreover, we cannot see how focusing on the use of property forecloses execution against intangible property. Our decision in *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir. 1989), helps illustrate how certain intangible property can uncontroversially be viewed as used in service of a commercial activity in the United States. The Bank cites *Atwood* for the proposition that the panel opinion departs from precedent. To the contrary, *Atwood* demonstrates that the panel opinion is consistent with the way we have interpreted the "used for" requirement in the past.

In *Atwood*, Petrobras, a Brazilian state instrumentality, contracted with Atwood, an American company, to drill oil wells off the coast of Brazil. As security for the sums due Atwood under the contract, Petrobras provided a letter of credit issued by an American bank. When Petrobras refused to pay Atwood, Atwood sued for breach of contract in federal court. Because the letter of credit was due to expire by its own terms, the district court issued a preliminary injunction requiring Petrobras to extend the letter of credit for one year from the date of the order or until all issues pertinent to the letter of credit were resolved. Petrobras appealed, arguing that none of the FSIA's

exceptions to immunity from prejudgment attachment, 28 U.S.C. § 1610(d), permitted attachment

of the letter of credit. Section 1610(d) provides:

> (d) The property of a foreign state . . . *used for a commercial activity in the United States*, shall not be immune from attachment prior to the entry of judgment in any action . . . if--
> (1) the foreign state has explicitly waived its immunity from attachment prior to judgment . . . and
> (2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

This section, like § 1610(a), includes the phrase "used for a commercial activity in the United States."

In *Atwood*, we concluded that Petrobras had contractually waived any immunity from prejudgment

attachment and affirmed the district court.

Although *Atwood* did not explicitly consider the "used for" requirement, Petrobras plainly

used the letter of credit for a commercial purpose within the ordinary meaning of the phrase "used

for." Petrobras used the letter of credit to secure the services of an American corporation to do

drilling work. As we explained in the panel opinion, "what matters is not how [the foreign state]

made its money, but how it spends it." In *Atwood*, the letter of credit did not represent the income

or the revenue from the commercial transaction, as the royalty and tax obligations do here. Rather,

Petrobras put the letter of credit in service of the commercial activity, it "spent" the letter of credit

on that activity. On the record before us, by contrast, the Congo has not put its intangible property

in the service of any commercial activity in the United States. The panel's definition of "used for"

is therefore fully consistent with our having permitted the prejudgment attachment in *Atwood*.[4,5]

---

[4]The Bank's petition cites a sentence in *Atwood* out of context for the proposition that any intangible property "contemplated by" a commercial transaction is thereby "used for" that transaction. *Atwood*'s discussion of the FSIA focused mainly on whether Petrobras had contractually waived its immunity from prejudgment attachment. The relevant contract provided:

B. *Waiver of sovereign immunity.* The Borrower [Petrobras] acknowledges and agrees that

The *Atwood* case shows how courts can determine, without speculation, that the intangible property of a foreign state is used for a commercial activity in the United States. In this case, for example, the royalty and tax obligations would be used for a commercial activity in the United States if the Congo used them as collateral for loans obtained from United States banks. There is nothing so inherently speculative about the use of intangible property that courts cannot meaningfully ascertain how such interests are used by the foreign states that own them.

---

> the activities *contemplated by* the provisions of this agreement and the notes are commercial in nature . . . and therefore acknowledges and agrees t hat it is not entitled to any right of immunity on the grounds of sovereignty . . . in any legal action or proceedings arising out of or *relating to* this agreement or the notes.

*Atwood*, 875 F.2d at 1177 (emphasis added). The phrases "contemplated by"and "related to" in *Atwood* refer to language in the *waiver agreement*, not to language in the statute. The phrase occurs in the text of the *Atwood* opinion immediately after the relevant excerpt from the waiver agreement, in the following context:

> The instant case *relates to* the letter of credit which is an activity *contemplated by* the financing agreement. Accordingly, the *waiver provision* applies . . .

The phrase "contemplated by" in *Atwood* refers to the scope of Petrobras's waiver of immunity, not to the "used for" requirement of § 1610(d). That the royalty and tax obligations at issue here may have been "contemplated by" the joint venture with the American oil companies does not mean that those obligations are used by the Congo for that joint venture.

[5]Moreover, our definition of "used for" corresponds to the way that district courts have dealt with execution against foreign state bank accounts (a form of intangible property). Those courts have focused on the use of the accounts rather than on the source of the money in the account. For example, in *Liberian Eastern Timber Corp. v. Republic of Liberia*, 659 F. Supp. 606 (D.D.C. 1987), the District Court for the District of Columbia held that bank accounts "utilized for the maintenance of the full facilities of Liberia to perform its diplomatic and consular functions . . . including payment of salaries and wages of diplomatic personnel and various ongoing expenses incurred in connection with diplomatic and consular activities" were not "used for" a commercial activity within the meaning of the FSIA. The focus was plainly on how the money from the accounts was spent, not where it came from. Other district court cases have employed similar reasoning. *See Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16, 24 (D.D.C. 1999) (holding that bank accounts used for the repair and maintenance of noncommercial real estate were not "used for" a commercial purpose and therefore were immune from attachment).

-10-

## V

Finally, our focus on the use of a foreign state's property does not in any way conflict with the Supreme Court's decision in *Republic of Argentina v. Weltover*, 504 U.S. 607 (1994), which explored the meaning of the phrase "commercial activity" in the FSIA. Nothing in the panel opinion concerns the definition of "commercial activity": we assume for the sake of argument that the joint venture with the American oil companies was indeed a "commercial activity." Instead, we focus on the phrase "used for," a phrase nowhere found in the jurisdictional commercial activity exception discussed in *Weltover*. The *Weltover* court summarized its holding as follows:

> [W]e conclude that when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce."

*Id.* at 614 (internal citations omitted). *Weltover* holds that we may not refer to the purpose of a sovereign state's activity in classifying its *activity* as commercial or noncommercial. Here, to the extent we have looked to purpose at all, we have looked to the purpose of the *property*, not the purpose of the *activity*. *Weltover* has nothing to say about the definition of "used for," and nothing in that opinion commands or suggests that "used for" denotes anything other than its ordinary meaning.

## VI

We interpret statutes according to their plain meanings. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989). In ordinary usage, we would not say that someone uses the revenue

-11-

or income of a transaction for that transaction. The Bank uses a number of phrases to describe the relationship of the royalty and tax obligations to the allegedly domestic commercial activity: the obligations are "contemplated by" the activity, they are "necessary to" or "integral to" the activity, they are "related to" the activity. All of these relationships plainly differ from the relationship demanded by the statute: a "used for" relationship. Accordingly, we remand to the district court to determine how the Congo uses its royalty and tax obligations. How these obligations were generated is of no account under the plain language of the statute.

This appeal comes to us on a motion to dismiss. As such, there is little factual development in the record about how the royalties and tax obligations are used. We therefore vacate the dismissal of the garnishment action, which was based on the district court's conclusion that the oil joint venture between the Congo and the garnishees was not "commercial activity in the United States." Even assuming that the district court was correct in this conclusion, that would tell us only how the royalties and tax obligations were generated, not how they are used. We remand to the district court for further consideration of the dispositive factual question, what the royalty and tax obligations are "used for."[6] If it turns out that the royalties and tax obligations are not used for any commercial

---

[6]Our decision to vacate the dismissal of the garnishment action obviates the need to reach two additional issues argued on appeal: whether Texas law permitted the district court's award of attorneys' fees and whether the Bank was entitled to additional discovery. Consideration of the attorneys' fees issue would be premature at this time. Under Texas law, "where the [garnishee's] answer is contested, the costs shall abide the issue of the contest." TEX. R. CIV. P. 677. Because we do not yet know how the "issue of the contest" will be resolved, it is too soon to consider any attorneys' fees issues.

With respect to discovery, the district court may on remand limit any additional discovery to facts relating to the immunity determination. *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992); *Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 849 (5th Cir. 2000); *First City, Texas-Houston, N.A. v. Rafidian Bank*, 150 F.3d 172, 176-77 (2d Cir. 1998). Even with respect to the immunity issue, the district court should order discovery "circumspectly and only to verify allegations of specific facts crucial to [the] immunity determination." *Arriba Ltd.*, 962 F.2d

-12-

activity in the United States, the district court should dissolve the writs of garnishment and dismiss the action.

at 534. The scope of discovery on exceptions to foreign sovereign immunity is a matter of the district court's discretion. *Kelly*, 213 F.3d at 849.

**UNITED STATES COURT OF APPEALS**

**FIFTH CIRCUIT**

_____

No. 01-50409

_____

CONNECTICUT BANK OF COMMERCE,

Plaintiff - Appellant-Cross-Appellee,

versus

THE REPUBLIC OF CONGO,

Defendant - Appellee

and

CMS OIL AND GAS COMPANY; CMS OIL AND GAS

(INTERNATIONAL) COMPANY; CMS NOMECO INTERNATIONAL CONGO HOLDINGS, INC; CMS NOMECO CONGO, INC; CMS OIL AND GAS (HOLDINGS), LTD; CMS OIL AND GAS (INTERNATIONAL) LTD; CMS NOMECO CONGO LDC; CMS OIL AND GAS (CONGO) LTD; NUEVO ENERGY COMPANY; THE CONGO HOLDING COMPANY; THE NUEVO CONGO COMPANY; NUEVO CONGO LTD; NUEVO INTERNATIONAL, INC; NUEVO INTERNATIONAL HOLDINGS LTD

Garnishees - Appellees-Cross-Appellants.

Appeal from the United States District Court

for the Western District of Texas

ON PETITION FOR PANEL REHEARING

Before EMILIO M. GARZA, PARKER, and DENNIS, Circuit Judges.

PER CURIAM:

IT IS ORDERED that the Republic of Congo's motion for leave to file its petition for rehearing out of time is GRANTED.

IT IS FURTHER ORDERED that the Republic of Congo's petition for panel rehearing is DENIED. In the petition, the Congo points out that the majority opinion in this case neglected to address explicitly one of the two prongs of analysis under 28 U.S.C. § 1610(a). Section 1610(a) provides that, under certain circumstances, a judgment creditor may execute against the "property in the United States of a foreign state . . . used for a commercial activity in the United States." The majority opinion addressed the second of these clauses, but not the first. That is, it addressed whether the royalty and tax obligations at issue were "used for a commercial activity in the United States," but not whether the obligations were "property in the United States" within the meaning of the statute.

In our view, this omission does not require any change to the mandate of the majority opinion. The factual question of what the royalty and tax obligations are "used for" appears much less difficult on this record than the legal question of determining the situs of the intangible royalty obligations. Moreover, despite the Congo's arguments to the contrary, we continue to believe that the district court is the appropriate forum to resolve the factual question of how the Congo uses its property.

The petition for panel rehearing is therefore DENIED.

-16-

DENNIS, CIRCUIT JUDGE concurring in granting the Bank's petition for panel rehearing, and dissenting from denial of the Congo's petition for rehearing.

**I.**

I commend the majority opinion for recognizing that we interpret statutes according to their "plain meaning" and turning to the dictionary to determine what that meaning is for the words "used for" in FSIA § 1610(a)(1). Unfortunately the majority chooses to ignore those parts of the definition which do not support its overly-narrow construction of the term.

As the majority itself correctly notes, "used for" can mean "utilize." What the majority omits to mention is that "used for" also means "to put into action or service: have recourse to or enjoyment of: EMPLOY." Webster's Third New International Dictionary 2253 (Philip B. Gove ed., 3rd ed. 1993). See also Black's Law Dictionary 1540 (Bryan A. Gardner, ed., 7th ed. 1999) ("[t]he application or employment of something"); Merriam-Webster's Collegiate Dictionary 1301 (Frederick C. Mish ed., 10th ed. 1993) ("avail oneself of: EMPLOY...to expend or consume by putting to use"). Thus property is "used for commercial activity" if it is employed in, applied in the service of, or utilized for commercial activity.

The majority not only uses an improperly truncated and cramped meaning of "use", it also mischaracterizes the assets at issue in this case which the Bank seeks to attach. In order to make its argument work, the majority incorrectly describes Congo's royalty interest as "revenue" or "income,"

-17-

i.e., as the results or fruits of the Congo's right to receive royalties rather than the property right itself. On the contrary, however, a landowner royalty interest is an intangible property interest entitling its owner to a share of production, in kind or cash, if, as and when there is production, free of the costs of production. See 8 Howard R. Williams & Charles J. Meyer, Oil and Gas Law 952 (2001). See also Jensen v. Wilkinson, 133 S.W.2d 982, 984 (Tex. Civ. App. 1939)("...the usual and customary way for a land-owner to realize on the value of his land for oil is to get it leased, retaining royalty rights, and through such royalty rights to share in the profits which it is hoped will issue from his land in the form of oil production, or to sell such royalty rights or portions thereof to others."); 30 LA. REV. STAT. ANN. § 80 ("A mineral royalty is the right to participate in production of minerals from land owned by another or land subject to a mineral servitude owned by another. Unless expressly qualified by the parties, a royalty is a right to share in gross production free of mining or drilling and production costs."); John S. Lowe, Oil and Gas Law in a Nutshell 43 (1995) ("A landowner's royalty...is the interest in production retained by the lessor in the royalty clause of the oil and gas lease.").

A simple analogy helps here. The relationship between a royalty interest and the proceeds from that interest is the same as between shares of stock and dividends owed as a consequence of ownership of shares. Just as a share of stock has existence and value separate from dividends, landowner royalty interest has existence and value as a property interest separate from the payments owed on that interest. See Jensen, 133 S.W.2d at 984 (explaining that value to royalty interest prior to oil production comes from "belief that the working interest, which is created by the same-self lease that creates the royalty rights, will be developed and operated"). And while the majority may reasonably think that it would be strange to describe revenue as "used for" the enterprise that created

it, it is certainly normal usage to consider shares of stock or royalty interest as "used for" the commercial activity which ultimately generates production and revenue.

The majority thus ignores both the ordinary meaning of "use" and misconceives the nature of the property interest involved here, to arrive at the conclusion that Bank has failed make a showing that the royalty interest is "used for" commercial activity. For these reasons I believe that the majority's analysis is incorrect.

I would reverse the district court's grant of summary judgment, and remand for further proceedings in light of the precepts discussed in my separate opinions.

## II.

In denying the Congo's request for an opinion on the situs of the royalty obligations the majority writes, "[t]he factual question of what the royalty and tax obligations are 'used for' appears much less difficult on this record than the legal question of determining the situs of the intangible royalty obligations."

I cannot comprehend why the difficulty of the situs question allows this court to shirk its duty in guiding the district court on a complex legal determination it may have to make. Such a conclusion is justifiable only by assuming that it is inevitable that the district court will find that the royalty interest is not "used for" commercial activity. If the majority *sub silentio* has already reached this decision, it should forthrightly declare the reasons for its conclusion. Although I likely would disagree with the reasons, they may reveal that the case should not be remanded or provide helpful guidance to the district court if it is remanded.

Upon further research I think that the situs question is one which deserves more attention, and one upon which the district court may need more guidance in answering. Accordingly, I

-19-

would grant the Congo's petition for rehearing for the purpose of clarifying and setting forth the legal principles controlling the situs determination.