**WELTOVER, INC.; Springdale Enterprises, Inc.; Bank Cantrade, A.G., Plaintiffs–Appellees,**

v.

**REPUBLIC OF ARGENTINA; Banco Central De La Argentina, Defendants–Appellants.**

No. 1446, Docket 91–7119.

United States Court of Appeals, Second Circuit.

Argued May 23, 1991.

Decided Aug. 13, 1991.

Richard J. Davis, New York City (Bonnie Garone, Allison Corey Miller, Weil, Gotshal & Manges, New York City, of counsel), for defendants-appellants.

Richard W. Cutler, New York City, for plaintiffs-appellees.

Before MESKILL, MINER and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

This appeal presents two issues of subject matter jurisdiction under the Foreign Sovereign Immunities Act of 1976 ("FSIA"). 28 U.S.C. §§ 1330, 1332(a)(2)–(a)(4), 1391(f), 1441(d), 1602–1611. We must first determine whether the act of a foreign sovereign in issuing debt instruments to foreign creditors for the stated purpose of controlling the nation's stock of foreign currency is "commercial activity" within the meaning of the FSIA. If it is,

we must then consider whether that action has a sufficient nexus with the United States to justify the exercise of subject matter jurisdiction over the foreign sovereign in an American court.

Plaintiffs, Weltover, Inc. ("Weltover"), Springdale Enterprises, Inc. ("Springdale"), and Bank Cantrade, A.G. ("Bank Cantrade"), sued defendants, the Republic of Argentina ("Argentina" or "the Republic") and Banco Central de la Argentina ("Banco Central"), to recover principal and interest due on certain bonds ("Bonods") issued by defendants. Plaintiffs are holders of a number of these Bonods with a total face value in excess of $1.3 million. Weltover and Springdale are Panamanian corporations; Bank Cantrade is a Swiss bank. Each plaintiff elected, pursuant to a contractual option provided for in the Bonods, to have payment made in New York. Upon defendants' default, plaintiffs commenced the present action. Defendants moved to dismiss for lack of subject matter jurisdiction under the FSIA, lack of personal jurisdiction, and *forum non conveniens*. Judge Sprizzo denied these motions. *Weltover, Inc. v. Republic of Argentina,* 753 F.Supp. 1201 (S.D.N.Y.1991).

■ Defendants now appeal just the district court's ruling that subject matter jurisdiction is proper under the FSIA. We have appellate jurisdiction pursuant to the "collateral order doctrine" of *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949). *See, e.g., Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 443 (D.C.Cir.1990) (denial of motion to dismiss for lack of subject matter jurisdiction under the FSIA is subject to interlocutory appeal under the "collateral order doctrine"). We affirm.

## BACKGROUND

Argentina's economic woes provide the backdrop for this controversy. Since the 1970's, Argentina has accumulated vast public and private foreign debts. Because Argentine currency—which, prior to 1985, was based on the peso and is presently denominated in australs—is not accepted on the international market as a valid medium of exchange, Argentina depends on its reserves of United States dollars and other internationally recognized currencies to satisfy foreign debt.

The rapid accumulation of foreign debt in the 1970's began to deplete Argentina's reservoirs of internationally accepted currencies. To cope with this economic miasma, Argentina's Ministry of Economy adopted austere measures in the early 1980's. Banco Central, as the Central Bank of the Republic, was charged with implementing these economic and foreign exchange policies. Pursuant to the crisis-management measures adopted by the Ministry of Economy, Banco Central, in 1981, began adjusting the prevailing foreign exchange rates, which led to a severe devaluation of Argentina's local currency. Devaluation of local currency obviously made it more expensive for Argentine debtors to obtain needed foreign exchange to satisfy their debts.

To counter the devaluation problem, Banco Central implemented the Republic's Foreign Exchange Insurance Contract ("FEIC") program. The purpose of the FEIC was to provide a means by which private debtors could obtain the necessary U.S. dollars at a particular exchange rate, thus avoiding the devastating consequences of the continued devaluation of the local currency. Specifically, the FEIC allowed private Argentine debtors to pay Banco Central a pre-determined amount of local currency upon maturity of the foreign debt; Banco Central would issue the debtor the amount of U.S. dollars required to repay the foreign debt. The amount of local currency that the debtor was required to pay Banco Central was calculated at the exchange rate prevailing at the time the contract was executed, thereby lessening the impact upon the debtor of subsequent devaluations of the local currency.

This creative financing bought Argentina some time since the FEIC contracts did not come due until 1982. However, the continued economic crisis in Argentina found the Republic and Banco Central in 1982 with an insufficient stock of U.S. dollars to enable

the private debtors to retire these old debts. Defendants next decided to refinance these obligations by issuing two forms of debt instruments: (1) bonds payable in U.S. dollars (Bonods), and (2) promissory notes.

The Bonods—which are at issue here—provided for payment of principal and interest in U.S. dollars, with interest to be based on the London Interbank rate for Eurodollar deposits. Payment was to be made on either the New York, London, Frankfurt, or Zurich markets, at the election of the creditor. This refinancing program gave the foreign creditor the option of accepting the Bonods in satisfaction of the initial debt, thus releasing the private debtors and substituting defendants as the debtors, or maintaining the debtor/creditor relationship with the original Argentine debtor and accepting the Bonods as guarantees and the defendants as guarantors. For issuing some $1.3 billion in Bonods, Banco Central received a one-tenth of one percent service fee ($1.3 million) from the Secretariat of State for Finance to cover the service costs. Under Argentine foreign exchange regulations adopted by the Ministry of Economy, only Banco Central could pay the creditors in U.S. dollars.

In the tumultuous years following issuance of these Bonods, Argentina's economic slide continued. On May 23, 1986, soon after initial payments of interest were made on the Bonods, the Republic determined that it was still unable to meet its foreign debt obligations. A Presidential Decree required the Ministry of the Economy to direct Banco Central to establish, yet again, alternative means to pay foreign debt instruments such as the Bonods. Pursuant to this Decree, Banco Central unilaterally extended the time for payments on the Bonods, labelling this a "rescheduling." Plaintiffs, holders of the Bonods, refused to accept this "rescheduling" of payment, and brought the present action to compel defendants to honor their obligations.

In denying defendants' motion to dismiss for lack of subject matter jurisdiction under the FSIA, the district court held that defendants' actions in issuing and "re-scheduling" the Bonods fit within the "commercial activity" exception of section 1605(a)(2) of the FSIA. *Weltover*, 753 F.Supp. at 1205–07. Judge Sprizzo explored the nature of the act of issuing public debt and determined that it constituted "commercial activity." *Id.* at 1205–06. He went on to hold that there was a sufficient nexus between defendants' acts and the United States to justify the exercise of subject matter jurisdiction by an American court. *Id.* at 1206–07.

## DISCUSSION

Traditional precepts of international law accord sovereign immunity to foreign countries and their agencies or instrumentalities. In its pristine form, the doctrine of sovereign immunity was absolute, but as governments increasingly entered the marketplace to undertake what had previously been private commercial enterprise, the doctrine began to erode. The FSIA now provides a means by which a foreign sovereign and its agencies or instrumentalities may be subjected to the jurisdiction of American courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989). The Republic and Banco Central are foreign states within the meaning of the FSIA. *See* 28 U.S.C. § 1603(a) & (b). The parties do not dispute any of these basic principles.

■ The FSIA codifies the only exceptions to the traditional notion of absolute foreign sovereign immunity. *See* 28 U.S.C. §§ 1605–1607; *see also* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6605 ("*House Report*") (FSIA codifies the "restrictive" theory of foreign sovereign immunity that was first adopted by the Department of State in the famous Tate Letter of 1952). When one of these exceptions applies, the foreign sovereign is stripped of immunity, and, pursuant to 28 U.S.C. § 1330(a), subject matter jurisdiction exists in the district court. *See Amerada Hess Shipping Corp.*, 488 U.S. at 434, 109 S.Ct. at 688; *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493, 103 S.Ct. 1962,

1971, 76 L.Ed.2d 81 (1983). Whether the Republic and Banco Central may assert immunity thus turns on whether one of the FSIA's exceptions applies.

■ We are called on to determine whether defendants' act of issuing the Bonods and subsequently failing to pay the bonds on time falls within the so-called "commercial activity" exception of the FSIA. 28 U.S.C. § 1605(a)(2). Specifically, section 1605(a)(2) provides:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

. . . .

(2) in which the action is based [i] upon a commercial activity carried on in the United States by the foreign state; or [ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [iii] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

All parties agree that the third clause [iii] of subsection (2) governs the present case. The issues, then, are whether defendants engaged in "commercial activity," as opposed to sovereign activity, and whether such activity has caused a "direct effect in the United States." Judge Sprizzo answered both questions in the affirmative and we agree.

*Commercial Activity*

Congress' definition of "commercial activity" is our starting point, although it provides limited guidance: "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

■ Obviously aware that this Olympian generality might be thought unilluminating, Congress explained that it would be both unnecessary and unwise "to attempt an excessively precise definition of ['commercial activity']." *House Report* at 6615. Instead, Congress intended to grant a "great deal of latitude" to the federal courts in distinguishing between commercial acts and sovereign acts. *Id.; see Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308–09 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). The House Report, however, listed several examples of activities by a foreign sovereign that would fall within the definition of commercial activity. One such illustration is a foreign government's "borrowing of money." *House Report* at 6615.

■ This Court has attempted to establish somewhat less amorphous standards for determining what is commercial activity. We have construed the FSIA to mean that "if the activity is one in which a private person could engage, [the foreign sovereign] is not entitled to immunity." *Texas Trading*, 647 F.2d at 309. Other circuits have basically taken the same pragmatic approach. *See, e.g., Rush–Presbyterian–St. Luke's Medical Center v. Hellenic Republic*, 877 F.2d 574, 578 (7th Cir.) ("If a private person could have engaged in the same *type* of activity, then the sovereign has presumptively engaged in 'commercial activity' within the meaning of the FSIA....") (emphasis in original), *cert. denied*, 493 U.S. 937, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989); *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1549–50 (D.C.Cir.1987).

It should be noted, however, that the Seventh Circuit appears to have read too much into our holding in *Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985). In *Rush–Presbyterian*, the Seventh Circuit intimated that, for acts to be considered commercial, the Second Circuit requires a showing that the activities could be conducted by a private person *and* that the foreign sovereign has

a profit motive. *See Rush–Presbyterian,* 877 F.2d at 578 n. 4. *Letelier* did not so hold, and we reject this gloss.

In *Letelier* we stated that, for an act to be considered commercial, it must be the type that a private person could engage in. 748 F.2d at 797. We continued by stating that "the court must inquire whether the activity is of the type an individual *would customarily* carry on for profit." *Id.* (emphasis added). *Letelier* did not go so far as to require a profit motive on the part of the foreign sovereign. Such a requirement would eviscerate the "commercial activity" exception of the FSIA, because foreign sovereigns often act without a profit motive. Our decision in *Letelier* clearly did not intend such a result. Rather, *Letelier* instructs that where a private party would customarily engage in an activity for profit, there can be little question that that private party is engaging in commercial activity. *See House Report* at 6615; *Joseph v. Office of Consulate General of Nigeria,* 830 F.2d 1018, 1024 (9th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988). When a foreign sovereign engages in the same conduct, that activity retains its commercial nature, even though the foreign sovereign acts without a profit motive.[1]

■ In considering whether a private person could engage in the activity in question, and would normally conduct such activity for profit, we must isolate the specific conduct that underlies the suit, rather than focusing on "the broad program or policy of which the individual transaction is a part." *Rush–Presbyterian,* 877 F.2d at 580; *see Texas Trading,* 647 F.2d at 308 (court must identify particular conduct that is relevant). Were we to define the relevant conduct overbroadly, the activity would almost inevitably be characterized as sovereign in nature, rather than commercial. Foreign sovereigns constantly implement broad programs intended to stimulate

their economy or to avoid economic catastrophe. Each of these programs, however, is implemented through numerous individual transactions. To imbue each transaction with a sovereign character simply because it is part of a broader governmental scheme would run afoul of the FSIA's restrictive theory of foreign sovereign immunity. *See House Report* at 6605 (immunity for foreign states restricted to public acts of the sovereign). Overbroad definition of the issue takes the Court perilously close to the shadowy line between the *nature* and the *purpose* of the activity in question. The FSIA clearly dictates that, in distinguishing commercial acts from sovereign acts, courts should refer to the nature of the activity, and not its purpose. 28 U.S.C. § 1603(d).

We recognize, of course, that "nature" and "purpose" are closely-knit concepts and that "the purpose of an act may be *relevant* in defining its nature...." *Joseph,* 830 F.2d at 1023 (emphasis in original); *see also De Sanchez v. Banco Central De Nicaragua,* 770 F.2d 1385, 1393 (5th Cir.1985) ("[o]ften, the essence of an act is defined by its purpose"). Nevertheless, the activity's purpose must remain ancillary to its nature, and we must " 'confine any consideration of purpose as closely as we can, considering that purpose *only so far as is absolutely necessary* to define the nature of the act in question.' " *Rush–Presbyterian,* 877 F.2d at 577–78 (quoting *Segni v. Commercial Office of Spain,* 835 F.2d 160, 164 (7th Cir.1987) (emphasis added)). When the nature of an act is transparent by reference merely to the type of activity, the purpose should not bear on the outcome.

We turn now to Argentina's activity in this case. Putting to one side defendants' attempts to cast this controversy in Keynesian terms as a response to Argentina's economic straits, we note that this case revolves around defendants' issuance of the Bonods as public debt, and the subse-

---

**1.** The district court found that the 0.1% commission received by Banco Central represents a profit. We express no view on this conclusion, for we note again that a foreign sovereign need not have a profit motive for its acts to be com-

mercial. *See Letelier,* 748 F.2d at 797; *Joseph,* 830 F.2d at 1024 (profit motive not a *"threshold requirement"* for commercial activity) (emphasis in original).

quent failure to retire that public debt upon maturity. The nature of this activity—the issuance of debt instruments—is clearly the type of activity that private persons can, and often do, engage in for profit. Recently, we stated that "[i]t is self-evident that issuing public debt is a commercial activity within the meaning of Section 1605(a)(2)." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir.1991) (negotiable promissory notes issued by the Republic of Bolivia); *see Carl Marks & Co. v. Union of Soviet Socialist Republics*, 841 F.2d 26, 27 (2d Cir.) (per curiam) (issuance of public debt by Russian Imperial Government in 1916 would have been commercial activity had the FSIA been in effect at the time), *cert. denied*, 487 U.S. 1219, 108 S.Ct. 2874, 101 L.Ed.2d 909 (1988); *see also House Report* at 6615 (foreign sovereign's borrowing of money is an example of commercial activity). Because defendants' issuance of public debt—the Bonods—immersed them in the stream of international commerce in foreign currency, the nature of that act was commercial; there was nothing uniquely sovereign about this activity.

We decline defendants' implied invitation to characterize the conduct in issue as a governmental effort to conserve scarce resources, i.e., U.S. dollars. Such an overbroad characterization goes to the *purpose* of the entire program, rather than to the *nature* of the transaction in issue. *See Rush–Presbyterian*, 877 F.2d at 580 (cautioning against overbroad definition of the relevant conduct); *Texas Trading*, 647 F.2d at 308. The nature of this particular transaction is clearly commercial, and, thus, we need look no further.

■ Because the issuance of the debt was a commercial activity, the subsequent breach of contract cannot be cloaked in immunity. Once a sovereign enters the marketplace as a commercial actor, it " 'should be subject to all the rules of the marketplace.' " *Texas Trading*, 647 F.2d at 310 (quoting *Trendtex Trading Corp. v. Central Bank of Nigeria*, [1977] 2 W.L.R. 356, 369, 1 All E.R. 881). In *Texas Trading*, we implicitly discounted any claim that the breach itself could be imbued with a sovereign nature. *See id.* at 310. The focus must be on the nature of the underlying activity, rather than on the nature of the last act, i.e., the breach. We do not disagree that "[w]here a government enters into a contract in its sovereign capacity, then the breach of that contract partakes of the contract's initial sovereignty." *De Sanchez*, 770 F.2d at 1394. We believe, however, that the converse must hold true as well: where a sovereign enters the marketplace as a commercial actor, a subsequent breach of the commercial contract retains that commercial nature.

We therefore hold that the relevant acts were commercial in nature, rather than sovereign, and we proceed to consider whether the requisite nexus with the United States is present.

*Direct Effect in the United States*

■ In addition to finding that the foreign sovereign was engaged in commercial activity, the FSIA also requires a finding that the acts in question "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). In *Texas Trading*, we expressly left open the question whether a foreign sovereign's nonpayment to a foreign plaintiff of a debt payable in the United States suffices to meet this statutorily-mandated nexus. *Texas Trading*, 647 F.2d at 312. This question now squarely confronts us. We hold that defendants' acts caused a direct effect in the United States.

Parsing the statute and attempting to localize the injury is "an enterprise fraught with artifice." *Id.* We have cautioned that, rather than getting steeped in the metaphysics of such amorphous terms as "direct" and "in the United States," courts must be concerned with Congress' goal of opening the courthouse doors "to those aggrieved by the commercial acts of a foreign sovereign." *Id.; see Verlinden*, 461 U.S. at 490, 103 S.Ct. at 1969 (Congress intended the FSIA to provide access to American courts to both American and foreign plaintiffs). Thus, when deciding whether the effect was both "direct" and "in the United States," we must remain mindful of the congressional purpose.

152

█ This Court has never been persuaded that for an effect to be considered "direct" it must be both "substantial" and "foreseeable." *See International Housing Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 11 n. 2 (2d Cir.1989) (listing contrary cases from other circuits); *Martin v. Republic of South Africa*, 836 F.2d 91, 94 (2d Cir.1987); *Texas Trading*, 647 F.2d at 311 n. 32. The reference in the legislative history of the FSIA to section 18 of the Restatement (Second) Foreign Relations Law, which embodies the substantiality and foreseeability prerequisites, "is a bit of a *non sequitur*" because the Restatement section deals with the extent to which American substantive law may be applied to extraterritorial conduct, rather than the reach of a federal court's subject matter jurisdiction. *Texas Trading*, 647 F.2d at 311 & n. 32. The question before us is not whether American substantive law may govern the Bonods, but whether an American court has jurisdiction to hear the case. To frame the issue more precisely, "[t]he question is, was the effect sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case?" *Id.* at 313. Thus, for subject matter jurisdiction purposes— i.e., the authority of the court to entertain an action—we concern ourselves with the extent of the contact with the United States to determine whether that nexus sufficiently implicates the interests of the forum jurisdiction in controlling conduct within its borders.

█ We need not tarry long over whether the effect, in this case, was direct. There can be no question that, pursuant to the FSIA, a "direct" effect may occur as the result of a contractual violation. *See Carey v. National Oil Corp.*, 592 F.2d 673, 676–77 (2d Cir.1979) (per curiam). Where the plaintiff is a corporation, "the relevant inquiry under the direct effect clause ... is whether the corporation has suffered a 'direct' financial loss." *Texas Trading*, 647 F.2d at 312. For the financial loss to be "direct", the corporate entity must itself be placed in financial peril as an immediate consequence of the defendant's unlawful

activity. *See Upton v. Empire of Iran*, 459 F.Supp. 264, 266 (D.D.C.1978) (effect is "direct" where there is no intervening element), *aff'd*, 607 F.2d 494 (D.C.Cir.1979). When, as here, the breach of an agreement deprives the corporate plaintiff of capital to which it is lawfully entitled there is a direct financial loss to the plaintiff. Because defendants' breach of the Bonod agreement deprived plaintiffs of their contractual rights to receive payment in U.S. dollars, defendants' acts caused a direct effect to plaintiffs.

A more troublesome inquiry is whether the effect was sufficiently "in the United States" to warrant our exercise of subject matter jurisdiction. Localizing the effect in the United States is more problematic when, as here, the plaintiff is a foreign corporation having few, if any, other contacts with the United States forum. Clearly, a foreign sovereign's improper commercial acts cause an effect to the foreign corporate plaintiff in that plaintiff's place of incorporation or principal place of business. We believe, however, that a bright-line rule limiting the situs of an effect to the foreign plaintiff's domicile, place of incorporation, or principal place of business is too facile an interpretation of the FSIA. Were it so limited, it would be the rare instance in which any foreign plaintiff could be said to suffer a direct effect in the United States.

In determining where the effect is felt directly, courts often look to the place where legally significant acts giving rise to the claim occurred. *See Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C.Cir.1988) (legally significant event must occur in the United States). We have stated that "[a]n injury to a corporation occurs in some legally significant situs, for instance, ... a place designated for performance of a contract...." *Rafidain Bank*, 893 F.2d at 11 n. 3 (citing *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 121–122 (S.D.N.Y.1988)). While we determined in *Rafidain Bank* that subject matter jurisdiction did not lie under the FSIA, our rationale was based, in large measure, on the fact that "[p]ayment in New York City

was not a contractual requirement...."
*Id.* at 12.

In *L'Europeenne de Banque,* which we cited with approval in *Rafidain Bank,* the district court held that nonpayment of a debt which the foreign sovereign was contractually obligated to pay to the foreign plaintiff in the United States caused a direct effect in the United States. *See L'Europeenne de Banque,* 700 F.Supp. at 121–22. This was so because the United States had an interest in protecting the foreign plaintiff from the breach. *Id.* at 122 (citing Note, *Effects Jurisdiction Under the Foreign Sovereign Immunities Act and the Due Process Clause,* 55 N.Y.U.L.Rev. 474, 512 (1980)). Support for this position has been building in the district courts for several years. *See Rafidain Bank,* 893 F.2d at 13 (Kaufman, J., dissenting) (noting the recent trend to find a direct effect in the United States because of nonpayment of a debt due to a foreign plaintiff in the United States).

█ We have stated, albeit in a slightly different context, that public policy should make American courts available to foreign plaintiffs if this will preserve or even enhance New York's status as a world financial leader. *See Allied Bank Int'l v. Banco Credito Agricola de Cartago,* 757 F.2d 516, 521–22 (2d Cir.) ("act of state" doctrine), *cert. dismissed,* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). "The United States has an interest in maintaining New York's status as one of the foremost commercial centers in the world. Further, New York is the international clearing center for United States dollars." *Id.* at 521. Such policy considerations, while enunciated in relation to the "act of state" doctrine, have an equally direct bearing on the interest of New York in encouraging foreign debtors to pay their debts that are due in New York even though the plaintiffs are not domiciled in New York. These policy considerations bear directly on the ultimate FSIA question: Would Congress have wanted an American court to entertain an action such as the present one? We think the answer must be yes.

Here, the contract gave plaintiffs the option to call for payment in New York. Plaintiffs exercised that option. The legally significant act was defendants' failure to abide by the contractual terms; i.e., to make payments in New York. The effects occurred, in the first instance, in New York, when the plaintiffs' accounts were not credited with the outstanding amount of U.S. dollars. As such, the act of nonpayment caused a direct effect in the United States.

Public policy considerations compel the conclusion that Congress would have wanted an American court to entertain this action. New York, as a preeminent commercial center, has an interest in protecting those who rely upon that reputation to do business, whether through the banking industry or otherwise. *See Allied Bank,* 757 F.2d at 521–22; *L'Europeenne de Banque,* 700 F.Supp. at 122. If individuals or corporate entities become wary of their ability to protect their rights in business transactions conducted in New York they will look elsewhere. We think it clear that Congress, in enacting the "direct effects" clause of the commercial activity exception, intended American courts to entertain actions that promote the interests of forum jurisdictions in controlling conduct that occurs within their borders. Here, an assertion of subject matter jurisdiction fulfills that congressional intent.

## CONCLUSION

We hold that defendants' issuance of the Bonods and subsequent breach of the agreements was "commercial activity" within the meaning of the FSIA. Furthermore, defendants' commercial acts caused a direct effect in the United States, thus providing the statutorily-mandated nexus. As such, defendants are stripped of sovereign immunity, and the district court has subject matter jurisdiction.

Affirmed.