**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 01-50409

_____

CONNECTICUT BANK OF COMMERCE,

Plaintiff - Appellant - Cross-Appellee

versus

REPUBLIC OF CONGO,

Defendant - Appellee

CMS OIL AND GAS COMPANY; CMS OIL AND GAS (INTERNATIONAL) COMPANY; CMS NOMECO INTERNATIONAL CONGO HOLDINGS, INC.; CMS NOMECO CONGO, INC.; CMS OIL AND GAS (HOLDINGS), LTD; CMS OIL AND GAS (INTERNATIONAL) LTD; CMS NOMECO CONGO LDC; CMS OIL AND GAS (CONGO) LTD; NUEVO ENERGY COMPANY; THE CONGO HOLDING COMPANY; THE NUEVO CONGO COMPANY; NUEVO CONGO LTD; NUEVO INTERNATIONAL, INC; NUEVO INTERNATIONAL HOLDINGS LTD

Garnishees - Appellees-Cross-Appellants

_____

Appeals from the United States District Court
for the Western District of Texas

_____

July 17, 2002

Before EMILIO M. GARZA, PARKER, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The Connecticut Bank of Commerce appeals the district court's judgment that the Foreign Sovereign Immunities Act renders royalty and tax obligations owed by certain Texas oil companies to the Republic of Congo immune from garnishment.

A predecessor in interest to the Connecticut Bank of Commerce (hereinafter "the Bank") lent the Congo $6.5 million. In the loan agreement, the Congo waived any right to claim foreign sovereign immunity either from suit or from attachment or execution of its property. The Congo defaulted on the loan. The Bank acquired the rights to a valid London judgment against the Congo for the outstanding principal and interest. In order to turn the foreign judgment into a U.S. judgment, the Bank filed suit in a state court in New York, as permitted by the terms of the loan agreement. The Congo did not appear in the New York action, and the state court entered a default money judgment in favor of the Bank.

The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 - 1611, provides foreign sovereigns with immunity from execution against their property to satisfy an adverse judgment. 28 U.S.C. § 1609. This statutory immunity is subject to several exceptions. One exception is that, if a foreign sovereign waives its immunity from execution, U.S. courts may execute against "property in the United States . . . used for a commercial activity in the United States." 28 U.S.C. § 1610(a)(1). Even when a foreign state completely waives its immunity from execution, courts in the U.S. may execute only against property that meets these two statutory criteria. *Id.*

Only a court may execute against a foreign sovereign's property under the FSIA. 28 U.S.C. § 1610(c) ("No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution . . ."). Some jurisdictions permit

judgment creditors to execute against property simply by applying to the clerk of the court or to a sheriff. Section 1610(c) does not permit such summary procedures to be used when a foreign sovereign's property is involved. Instead, it requires a court to enter the writ of execution, so that the court can determine whether the property in question falls within one of the statutory exceptions to foreign sovereign immunity.

After obtaining the default judgment from the New York state court, the Bank asked that court to enter what it called a "1610(c) order." The only order mentioned by § 1610(c) is an order actually attaching or executing against property. 28 U.S.C. § 1610(c) ("the court has ordered such attachment or execution . . ."). The New York court, however, acting at the Bank's request, entered a "1610(c) order" that did not purport to execute against any property within New York or elsewhere. Instead, it provided in declaratory terms that the Bank had "permission" to execute against the Congo's property wherever it may be found. The New York court authorized the Bank to execute against "any assets or other property of the Congo of any nature, irrespective of the use or intended use of such property . . . including any . . . payments or obligations due to the Congo from any oil and gas exploration and development companies . . . ."

The Bank registered its New York judgment in Texas state court and obtained, from the clerk of the Texas state court and without any court order, a writ of garnishment directed to a group of Texas oil companies: CMS NOMECO Congo, Inc., The Nuevo Congo Ltd., and some of their affiliate companies (hereinafter "the garnishees"). The writs of garnishment prohibited the garnishees from paying any debts to the Congo. The Congo and the garnishees removed the garnishment action to the United States District Court for the Western District of Texas and filed a motion to dismiss. The district court dissolved the writs of garnishment and dismissed the action. It held that,

-3-

notwithstanding the obligations of the Full Faith and Credit statute and the New York court's "1610(c) order," it was not prohibited by res judicata from considering on a blank slate the amenability of the garnishees' debts to garnishment under the FSIA. It determined that the royalty and tax payments owed by the oil companies to the Congo did not arise from a "commercial activity in the United States," and therefore were not subject to garnishment. The Bank appeals.

**I**

The Full Faith and Credit Statute, 28 U.S.C. § 1738, does not bar the fresh consideration of whether the debts owed from the garnishees to the Congo are subject to garnishment under the FSIA because the New York court's determinations about garnishment were not necessary to any judgment issued by that court. Under New York law, extraneous determinations not necessary to sustain a default judgment are not entitled to any res judicata effect.

The Full Faith and Credit Statute, 28 U.S.C. § 1738, provides that the judgments of state courts "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." The statute extends to the federal courts the requirements of the Full Faith and Credit Clause of the Constitution, which applies of its own force only to state courts. *E.g.*, *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 483 n. 24 (1982). Section 1738 requires us to afford the New York court's "1610(c) order" the same preclusive effects that the order would enjoy in the New York courts. But we need not give any greater res judicata effect to the "1610(c) order" than New York itself would afford.

New York courts do not give preclusive effect to gratuitous determinations in a prior action. Res judicata operates to bar relitigation only of issues necessary to the judgment. *Rader v. Mfrs. Cas. Ins. Co. of Philadelphia*, 139 N.Y.S.2d 388 (N.Y. Sup. Ct. 1955), *aff'd,* 149 N.Y.S.2d 220 (N.Y.

-4-

App. Div. 1956); *Pike v. Irving*, 19 N.Y.S.2d 219 (N.Y. App. Div. 1940); *Finkelstein v. Equitable Life Assur. Soc. of the United States*, 11 N.Y.S.2d 135 (N.Y. App. Div. 1939), *aff'd*, 23 N.E.2d 19 (N.Y. 1939). Especially in the case of a default judgment, res judicata applies only to issues essential to support the judgment as requested by the *pleadings*; subsequent developments in the case cannot enlarge the scope of the judgment or the scope of res judicata beyond the complaint. *Novak & Co. v. N.Y. City Hous. Auth.*, 482 N.Y.S.2d 7 (N.Y. App. Div. 1984) ("Since the prior judgment was on default, the issues necessarily determined there are limited to those essential to the judgment."); N.Y. C.P.L.R. 3215(b) (McKinney 2001) (providing that, in a default judgment, the "judgment shall not exceed in amount or differ in type from that demanded in the complaint"). Any determinations beyond those necessary to sustain the judgment requested by the pleadings do not preclude subsequent reexamination.

For example, in *Finkelstein*, the defendant issued a number of insurance policies to the plaintiff. Some of the policies paid benefits when the insured became "presumably permanently disabled" (type 1 policies) and others paid benefits only when the insured became actually "permanently disabled" (type 2 policies). Under New York law, this difference in phrasing had an important legal effect. Under a type 1 policy, if the insured was disabled for a certain period of a time set out in the policy, he was entitled to an irrebutable presumption of permanent disability. Under type 2 policies, being disabled for the amount of time set out in the policy gave rise to a presumption of permanent disability, but the presumption could be rebutted. In a prior action, Finkelstein obtained a judgment on a type 1 policy. He later brought an action on other policies, both type 1 and type 2, asserting that res judicata barred relitigation of the issue of his disability. The Appellate Division held that the prior action was not res judicata as to the type 2 policies, even if the previous court had

-5-

determined that Finkelstein was not only "presumably" disabled, but that he was actually disabled. It reasoned that "in the prior action all that the insured was required to establish was total and presumably permanent disability . . . anything more than that which the insured may have proved was not within the issues in that action, and, hence, *the judgment as to such extraneous matters is not res judicata*." *Finkelstein*, 11 N.Y.S.2d at 138 (emphasis added). This principle applies *a fortiori* to default judgments, where it would be impossible for the defendant to predict in advance of his default any extraneous determinations a court might make. *See Pike*, 19 N.Y.S.2d at 303-304 (limiting the res judicata effect of a prior default judgment to the "claim as alleged in [the] complaint" and reasoning that the defendant's "default, for whatever reason, did not authorize the entry of a judgment against him beyond the scope of the prayer for relief").

To the extent that the New York court made determinations about the amenability of the Congo's property to garnishment, those determinations were not in any way necessary to the money judgment sought by the pleadings. Here, the only pleading was the bank's complaint[1], which sought to convert a money judgment in London into a money judgment in New York. The New York court awarded the money judgment when the Congo failed to appear. The Congo does not challenge the validity of that judgment. Under New York law, the pleadings define the scope of a default judgment and therefore the scope of res judicata. N.Y. C.P.L.R. 3215(b); *Novak & Co.*, 482 N.Y.S.2d at 8-9. To the extent that the New York court made legal determinations not necessary to awarding the money judgment, those determinations are not entitled to any res judicata effect.

---

[1]The Bank actually plead by way of a "Motion for Summary Judgment in Lieu of Complaint," apparently a permissible pleading under New York law. For the sake of simplicity, we will refer to the Bank's pleading as its "complaint."

Here, the "1610(c) order" and the determinations contained in the order were not necessary to awarding the money judgment. Section 1610(c) has nothing to do with the merits of an action against a foreign state, and does not somehow turn the amenability of a foreign state's property to garnishment into a necessary part of the merits court's consideration. Section 1610(c) is directed entirely to a court attaching or executing against a foreign state's property, and not at all to the merits court. The statute provides:

> No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.[2]

The statute has three elements. First, as discussed above, its chief purpose is to provide that only a court may enter an order of attachment or execution against a foreign state's property. 28 U.S.C. § 1610(c) ("until the *court* has ordered such attachment and execution").[3] Second, it provides that the court may order the attachment or execution only as "referred to in subsections (a) and (b)." Subsections (a) and (b) spell out the exceptions to the general rule that a foreign sovereign's property is immune from execution or attachment. *See* 28 U.S.C. § 1609. Third, the court may execute

_____

[2]28 U.S.C. § 1608(e) requires that a copy of any default judgment entered against a foreign state be served on that state in the same manner proscribed by statute for serving complaints against foreign states.

[3]The House Report explains that the purpose of § 1610(c) is to require a court to issue the order of attachment or execution. It explains:

> Section 1610(c) prohibits attachment or execution under sections 1610(a) and (b) unless the court has issued an order for such attachment and execution. In some jurisdictions in the United States, attachment and execution to satisfy a judgment may be had simply by applying to a clerk or to a local sheriff. This would not afford sufficient protection to a foreign state.

H.R. REP. NO. 94-1487, at 30 (1976).

against property only after "determining that a reasonable period of time has elapsed following entry of judgment." This phrase requires courts to acknowledge, for example, that a foreign sovereign may have to pass separat e legislation to authorize the payment of the necessary funds. H.R. REP. NO. 94-1487, at 30 (1976). It allows courts discretion to wait for a foreign sovereign to make alternate arrangements to pay a debt before executing against any property. *Id.* Nothing in section 1610(c) directs itself to the court issuing the judgment on the merits; it is all directed to the court ordering "such attachment or execution." Nothing in § 1610(c) makes any determination about the amenability of a foreign sovereign's property to attachment or execution a necessary part of the underlying money judgment.

The "1610(c) order" had no effect in the New York litigation at all: the determinations in the "1610(c) order" could conceivably have legal effect only if some other court actually executing on the Congo's property were to treat the order as res judicata. The order was therefore not necessary to any coercive relief prayed for in the complaint or granted by the state court, and under New York law the order is not entitled to any preclusive effect.

Although the Bank does not say so in as many words, it essentially asks us to treat the New York court's "1610(c) order" as a declaratory judgment, as a separate and distinct form of relief from the money judgment issued by the New York court. It points out that its motion requesting the "1610(c) order" was served separately on the Congo. But the Bank's complaint did not seek a declaratory judgment against the Congo, it sought a money judgment. If the Bank had filed what was clearly a declaratory judgment action, then we would have a different situation. Nor could the post-judgment motion requesting the 1610(c) order enlarge the scope of the issues determined by the default judgment. As explained above, New York law limits the scope of a default judgment to the

issues necessary to resolve the questions raised by the *pleadings*. N.Y. C.P.L.R. 3215(b) (McKinney 2001); *Novak & Co.*, 482 N.Y.S.2d at 8-9. The post-judgment motion asking for a 1610(c) motion was not a pleading. N.Y. C.P.L.R. 3011 (McKinney 2001) ("There shall be a complaint and an answer. . . .There shall be no other pleading unless the court orders otherwise."). Almost any gratuitous determination could retroactively be termed a "declaratory judgment." If the Bank wanted a declaratory judgment, it needed to ask for one in its complaint.

New York does not require civil litigants to show up in court only to fall on their swords. If a defendant does not contest his liability to the plaintiff as set out in the complaint, he need not appear in the action. Defaulting does not carry the risk that the court will enter a judgment or make determinations not essential to awarding the relief called for in the complaint. The action in New York was an action to turn a money judgment in London into a money judgment in New York. The Congo had no way of knowing from the complaint that the New York court would make determinations and issue declarations that had nothing to do with a money judgment. The immunity of the royalty and tax payments to garnishment was not a defense to a claim for money damages, and whatever the New York court may have said about the immunity of the Congo's assets to execution had nothing to do with the merits of the action it was considering. Such statements were mere superfluities. Now that the immunity of these assets to garnishment really is in issue, the Congo is not precluded from asserting its sovereign immunity defense.

**II**

Under the FSIA, courts may attach only a foreign state's "property in the United States" when that property is "*used for* a commercial activity in the United States." 28 U.S.C. § 1910(a) (emphasis added). What matters under the statute is what the property is "used for," not how it was generated

-9-

or produced.  If property in the United States is used for a commercial purpose here, that property is subject to attachment and execution even if it was purchased with tax revenues or some other noncommercial source of government income.  Conversely, even if a foreign state's property has been generated by commercial activity in the United States, that property is not thereby subject to execution or attachment if it is not "used for" a commercial activity within our borders.  The district court (and the litigants) have focused on the question of whether the Congo's joint venture with the garnishees, which gave rise to the royalty and tax obligations that the Bank wants to garnish, was a "commercial activity in the United States."  This was the wrong question to consider.  What matters under the statute is not how the Congo made its money, but how it spends it.  The amenability of these royalties and taxes to garnishment depends on what they are "used for," not on how they were raised.

Until 1952, the United States generally afforded foreign sovereigns absolute immunity from the jurisdiction of the courts, including complete immunity from execution. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983).  Unlike state or federal sovereign immunity, foreign sovereign immunity does not derive from the constitution. *Id.* Foreign sovereign immunity instead derives from concerns of grace and comity between nations.  As a result, the Supreme Court regularly deferred to the Executive Branch in determining whether to take jurisdiction over a case concerning a foreign sovereign. *Id.* The Executive was in a better position to anticipate the foreign relations consequences of subjecting a foreign state to suit in a U.S. court.  Under the theory of absolute sovereign immunity, the Executive would regularly recommend that courts decline to take jurisdiction over any case against a foreign sovereign.

In 1952, the State Department issued the "Tate Letter," which announced the Department's

adoption of the "restrictive" theory of foreign sovereign immunity. *Id.* at 486-87. Under the restrictive theory, which many other nations had already adopted, the State Department would continue to recommend immunity in suits concerning a foreign state's sovereign, public acts. The Department, however, would recommend denying immunity in suits based on a foreign sovereign's strictly commercial activities. The Tate Letter did nothing to modify the complete immunity enjoyed by foreign sovereigns from execution against their property. If a plaintiff successfully obtained a final judgment against a foreign sovereign, he still had to rely on the foreign state to pay the judgment voluntarily. H.R. REP. NO. 94-1487, at 8, 27 ("[T]he traditional view in the United States concerning execution has been that the property of foreign states is absolutely immune from execution. . . .Even after the 'Tate Letter' of 1952, this continued to be the position of the Department of State and of the courts."); RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 460 cmt. a (1987) (hereinafter "RESTATEMENT").

The FSIA shifted the responsibility to make determinations about foreign sovereign immunity from the State Department to the courts. *Verlinden*, 461 U.S. at 488. For the most part, the FSIA codifies the restrictive theory of sovereign immunity as described in the Tate Letter. *Id.* But the FSIA also modified the rule barring execution against a foreign state's property by "*partially* lowering the barrier of immunity from execution, so as to make this immunity conform *more closely* with the provisions on jurisdictional immunity in the bill." H.R. REP. NO. 94-1487, at 27 (emphasis added). For both immunity from jurisdiction and immunity from attachment, "commercial activity" generally constitutes the touchstone of the immunity determination. But immunity from execution is nevertheless narrower than jurisdictional immunity. *De Letelier v. Republic of Chile*, 784 F.2d 790, 798-99 (2d Cir. 1984). In *De Letelier*, the Second Circuit surveyed both the history of immunity

-11-

from execution and the international law context at the time Congress passed the FSIA. The court concluded that Congress intended to lift immunity from execution only "in part," that it did not intend to reverse completely the historical and international antipathy to executing against a foreign state's property even in cases where a judgment could be had on the merits. *Id.* It attributed the differences in phrasing between the jurisdictional (§ 1605) and execution (§ 1610) immunity sections in the FSIA to a deliberate choice to narrow the scope of immunity from execution.

Two subsections of the FSIA spell out the exceptions to immunity from execution. 28 U.S.C. § 1610(a) governs the immunity from execution of property belonging to foreign states. 28 U.S.C. § 1610(b) governs the immunity from execution of property belonging to an "agency or instrumentality" of a foreign state engaged in commercial activity in the United States. Subsection (a), regarding property belonging directly to a foreign state, permits execution only narrowly, when the property is "in the United States" and "used for a commercial purpose in the United States." Subsection (b) is broader; it permits execution of "*any* property in the United States" belonging to the agency or instrumentality, regardless of how the agency or instrumentality uses the property. Subsection (a) is generally thought to be more restrictive than subsection (b). *De Letelier*, 784 F.2d at 799 (explaining that Congress "was more cautious when lifting immunity from execution against property owned by the State itself.").

Because subsection (a) is intended to be narrower than subsection (b), we pay close attention to the differences in phrasing between the sections. Subsection (a) allows courts to execute only when the property is "used for a commercial activity," whereas subsection (b) permits execution of "any property," regardless of its use. The focus in subsection (a) is plainly on the "use" to which the property is put. As the Restatement explains, "For purposes of post-judgment attachment and

execution, the Foreign Sovereign Immunities Act draws a sharp distinction between the property of states and the property of state instrumentalities . . . The property of states may be attached only if it is or was used in commercial activity; the property of state instrumentalities may be attached without any such limitation, so long as the instrumentality itself is engaged in commercial activity in the United States." RESTATEMENT § 460 cmt. b.

Restricting execution against property belonging to foreign states depending on the "use" of that property, rather than its source, helps accomplish the purpose of limiting execution against property directly belonging to a foreign state more severely than execution against property belonging to an instrumentality. The premise is that agencies or instrumentalities engaged in commercial activity are akin to any other player in the market, and that their functions are primarily commercial. *Id.* On the other hand, the "primary function of states is government." *Id.* One of the chief motifs of the FSIA is to limit as much as possible disrupting the "public acts" or "*jure imperii*" of sovereigns, while restricting their purely commercial activity. H.R. REP. 94-1487, at 7. Confiscating funds that are being put immediately to some sovereign use interrupts a sovereign's public acts regardless of what kind of activity generated the funds, commercial or noncommercial. An example helps clarify the point. Consider an airplane owned by a foreign government and used solely to shuttle a foreign head-of-state back and forth for official visits. If the plane lands in the United States, it would not be subject to attachment or execution. The plane is not "used for" any commercial activity, in the U.S. or elsewhere. It plainly would not matter how the foreign government bought the plane, raised the purchase price, or otherwise came into ownership. Even if the government received the plane as payment from a U.S. company in an obviously commercial transaction, that would not somehow transform the "use" of the plane into a commercial use. Regardless of how the government came to

-13-

own the plane, a U.S. court could never under the terms of the FSIA confiscate a plane used solely to transport a foreign head-of-state on official business. Attaching the plane and selling it in execution of a judgment would go too far in interrupting the public acts of a foreign state.[4]

The phrase "used for" in § 1610(a) is not a mere syntactical infelicity that permits courts to look beyond the "use" of property, and instead try to find any kind of nexus or connection to a commercial activity in the United States. The statute means what it says: property of a foreign sovereign, unlike property belonging to a mere agency or instrumentality, may be executed against only if it is "used for" a commercial activity. That the property is revenue from or otherwise generated by commercial activity in the United States does not thereby render the property amenable to execution.

This appeal comes to us on a motion to dismiss. As such, there is little factual development in the record about how the royalties and taxes are used. We therefore vacate the dismissal of the garnishment action, which was based on the district court's conclusion that the oil joint venture between the Congo and the garnishees was not "commercial activity in the United States." Even assuming that the district court was correct in this conclusion, that would tell us only how the

---

[4]The Third Circuit relied on similar reasoning in *City of Englewood v. Socialist People's Libyan Arab Jamahiriya*, 773 F.2d 31 (3d Cir. 1985), in rejecting an attempt to attach real property used as a residence for Libya's Head of Mission to the United Nations. The city of Englewood argued that the property was subject to attachment because it was "acquired by Libya in a commercial transaction between a seller and a buyer." *Id.* at 36. The court rejected this argument, reasoning that if "acquisition of property in a particular commercial transaction or act indelibly stamped the property as used for commercial activity, even foreign embassies and chancelleries would be subject to execution. Plainly Congress did not intend a result so inconsistent with recognized principles of international law." *Id.* at 36-37. The determinative issue, according to the *Englewood* court, was not whether the property was acquired in a commercial transaction, but instead whether Libya's present use of the property was commercial. *Id.* at 37.

-14-

royalties and taxes were generated, not how they are used. We remand to the district court for further consideration of the dispositive factual question, what the royalty and tax payments are "used for."[5] If it turns out that the royalties and taxes are not used for any commercial activity in the United States, the district court should dissolve the writs of garnishment and dismiss the action.

VACATED and REMANDED for further proceedings not inconsistent with this opinion.

---

[5]Our decision to vacate the dismissal of the garnishment action obviates the need to reach two additional issues argued on appeal: whether Texas law permitted the district court's award of attorneys' fees and whether the Bank was entitled to additional discovery. Consideration of the attorneys' fees issue would be premature at this time. Under Texas law, "where the [garnishee's] answer is contested, the costs shall abide the issue of the contest." TEX. R. CIV. P. 677. Because we do not yet know how the "issue of the contest" will be resolved, it is too soon to consider any attorneys' fees issues.

With respect to discovery, the district court may on remand limit any additional discovery to facts relating to the immunity determination. *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992); *Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 849 (5th Cir. 2000); *First City, Texas-Houston, N.A. v. Rafidian Bank*, 150 F.3d 172, 176-77 (2d Cir. 1998). Even with respect to the immunity issue, the district court should order discovery "circumspectly and only to verify allegations of specific facts crucial to [the] immunity determination." *Arriba Ltd.*, 962 F.2d at 534. The scope of discovery on exceptions to foreign sovereign immunity is a matter of the district court's discretion. *Kelly*, 213 F.3d at 849.

DENNIS, CIRCUIT JUDGE, Concurring in vacating the district court's judgment and remanding the case for further proceedings but disagreeing in part with the majority opinion as to the controlling principles of law.

The pertinent provisions of the FSIA are:

§ 1610. Exceptions to the immunity from attachment or execution

(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--

(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver,

1.

In my opinion, the district court erred in failing to recognize that, in the loan agreement upon which the Bank's judgment against the Congo is based, the Congo explicitly waived its immunity from execution, as follows:

> (C) The Borrower consents generally in respect of any suit, action or proceedings arising out of or in connection with this Agreement to the giving of any relief, or the issuance of any process in connection with any such suit, action or proceedings including, without limitation, the [taking], enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment that may be made or given in such action or proceedings.
>
> (D) To the extent that the Borrower may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid or execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed) the Borrower agrees not to claim and waives such immunity to the fullest extent permitted by the laws of that jurisdiction intending, in particular, that in any proceedings taken in New York the foregoing waiver of immunity shall have effect under and be construed in accordance with the United States Foreign Sovereign Immunities Act of 1976.

There can be no reasonable doubt that the Congo thereby explicitly waived its immunity from execution of the judgment entered against it in New York in favor of the Bank in accordance with the FSIA §1610(a)(1).

2.

Under the undisputed facts, the property executed upon--the garnishees' intangible obligations to pay royalties--are in the United States, as required by FSIA § 1610(a). The garnishees are oil companies headquartered in Texas. The situs of a debt is the situs of the debtor in Texas. *Mo., Kan.*

-17-

*& Tex. Ry. Co. of Tex. v. Swartz*, 115 S.W. 275, 276 (Tex. Civ. App. 1908, no writ); See also, *Alliance Bond Fund v. Grupo Mexican de Desarrollo*, 190 F.3d 16, 25 n.9 (2nd Cir. 1999). The fact that the obligations to pay royalties may be satisfied, after their seizure at the election of the seizing judgment creditor, either by money paid in Texas or by oil delivered in the Congo, does not change the fact that the property executed upon—-the oil companies' obligations to pay royalties—-is located in Texas at the situs of the debtors' headquarters.

3.

The oil companies' obligations to pay royalties are property of the Congo being used for commercial activity in the United States in accordance with FSIA § 1610(a).

The FSIA defines "commercial activity" as:

> [E]ither a regular course of commercial conduct or a particular commercial transaction or act. The commercial nature of an activity shall be determined by reference to the nature of the course of conduct, rather than by reference to its purpose. 28 U.S.C. § 1603(d).

The Supreme Court held in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) that "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." Because FSIA § 1603(d) requires that an act's commercial character is to be determined by reference to its "nature" rather than its "purpose," the issue "is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives." *Id.* Instead, the question is "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* (quoting Black's Law Dictionary 270 (6ᵗʰ ed. 1990))(emphasis in the original). "[I]f

the activity is one in which a private person could engage, it is not entitled to immunity." *Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 309 (2d Cir. 1981).

The Congo entered a joint venture with American, Canadian, and Congolese companies to promote and conduct exploration and development of oil and gas from the Atlantic Ocean offshore of the Congolese coast. The Congo's objective was to obtain within the framework of the joint venture the cooperation and assistance of qualified and well-known oil companies in the exploration and development of the minerals under the best conditions of effectiveness. The joint venture agreement provided for the payment of mining royalties to the Congo. The companies agreed to provide the Congo with all geological information which could be useful in the exploitation of mineral substances. The companies agreed to jointly install and operate facilities of pipelines to pump out the mineral production. The companies agreed to consult and evaluate the construction of a hydrocarbon refinery in the Congo. The bank alleges, and the Congo does not dispute, the facts that the American oil companies pursued the joint venture as a commercial activity and provided a wide range of services, including management, planning, accounting services and direction in the United States; and the facts that the garnishees' presence in Texas has been continuous, and that it is from Texas that they have supervised, directed, and financed the activities that have given rise to their obligations to make royalty payments.

In *Weltover*, bond holders brought a breach of contract action against Argentina arising out of Argentina's unilateral rescheduling of the maturity dates for payment on certain government bonds. 504 U.S. at 609-10. A unanimous Court concluded that Argentina did not enjoy immunity from suit for its actions. The Court concluded that the issuance of the bonds was "commercial activity," and that the unilateral extension of the bonds' maturity dates by presidential decree was an act made "in

connection with" that activity. *Id.* at 617, 612. Rejecting Argentina's argument that the issuance of the bonds was not commercial activity because the bonds were issued for a sovereign purpose, the Court explained: "it is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so." *Id.* at 617 (emphasis in original).

In the present case, the Congo engaged in commercial activity by entering into a joint venture with American oil companies and others for the purpose of discovering and extracting oil and gas. A "joint venture" is by definition a "business undertaking by two or more persons engaged in a single defined project." Black's Law Dictionary 843 (7th ed. 1999); "shared profits and losses" is one of its necessary elements. *Id.* The joint venture agreement assigned the Congo the right to receive royalty payments on the minerals developed. There is nothing uniquely sovereign about a contract to enter a joint venture to discover and extract oil and gas with specified methods of sharing in profits and losses wherein one of the parties is a mineral owner entitled to receive royalties from production. Like the issuance of the "garden-variety debt instruments" in *Weltover*, "there is nothing about [Congo's action in entering and participating in the joint venture to exploit minerals] that is not analogous to a private commercial transaction." *Weltover*, 504 U.S. at 615-16. Congo engaged in commercial activity.

The district court concluded that the Congo did not engage in commercial activity because its contract with the oil companies was sovereign in nature and some of its activities were strictly sovereign. The district court relied on dictum in a Seventh Circuit case, *Rush-Presbyterian-St.Luke's Med Ctr. v. Hellenic Republic*, 877 F.2d 574, 578 (7th Cir. 1989)( "a contract whereby a foreign state grants a private party a license to exploit the state's natural resources is *not* a commercial activity, since natural resources, to the extent they are 'affected with a public interest,' are goods in which

only the sovereign may deal.")(citing and paraphrasing *MOL, Inc. v. People's Republic of Bangladesh*, 736 F.2d 1326, 1329 (9th Cir. 1984)(government's grant of license to capture and export rhesus monkeys for scientific experimentation not a commercial activity, since the agreement 'concerned Bangladesh's right to regulate its natural resources, [ ] a uniquely sovereign function").[6]

Unlike the situation in *MOL*, however, the Congo's actions did not stop with its initial action as sovereign, in the regulation of its natural resources, to open them to exploitation and development. The Congo went on to step down from its sovereign status and engage in a typical commercial activity, a joint venture contract with oil companies for the exploration, production, and sale on the world market of oil and gas. This is not something that only a sovereign can do. Even if the Congo's initial action in exposing its minerals to development was sovereign and regulatory, "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Weltover,* 504 U.S. at 607. See also, *Weltover Inc v. Republic of Argentina*, 941 F.2d 145, 151 (2d Cir. 1991)("[o]nce a sovereign enters the marketplace as a commercial actor, it should be subject to all the rules of the marketplace.")[7]

Because the Texas oil companies' obligation to pay royalties to the Congo were necessary

---

[6] The district court relied on a similar statement in *Jones v. Petty Ray Geophysical Geosource, Inc.*, 722 F.Supp. 343 (S.D. Tex. 1989), an alternative or unnecessary ground of the *Jones* decision which was not approved or relied upon by this Circuit in affirming on appeal. See *Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061 (5th Cir. 1992).

[7] "Foreign sovereigns constantly implement broad programs intended to stimulate their economy or to avoid economic catastrophe. Each of these programs, however, is implemented through numerous individual transactions. To imbue each transaction with a sovereign character simply because it is part of a broader governmental scheme would run afoul of the FSIA's restrictive theory of foreign sovereign immunity." *Weltover Inc. v. Republic of Argentina,* 941 F.2d at 150 (citing House Report at 6605)(immunity for foreign states restricted to public acts of the sovereign).

and integral to, and therefore used for, the joint venture commercial activity conducted, in substantial part in the United States, by the Congo and the other parties to the joint venture, those royalty obligations fell within the exceptions to immunity from execution provided for by FSIA § 1610(a)(1).

4.

Finally, in my view, the district court erred or abused its discretion in not allowing the Bank to conduct discovery before dismissing its garnishment proceeding. The Bank made a reasonable showing that the garnishees' obligations to pay royalties to the Congo is property of the Congo present in the United States, used for a commercial activity in the United States, and therefore not immune from execution upon an uncontested judgment entered by a court of a State. The district court's dismissal was tantamount to the conversion of a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment without giving all parties an opportunity to present all material made pertinent to such a motion by Rule 56. See Rule 12(b). The Bank's judgment against the Congo is valid and uncontested, and, in my opinion, upon the prima facie showing made by the bank, the Congo's property is squarely within the exceptions to the immunity from execution provided by FSIA § 1610(a)(1). Accordingly, the district court should have allowed full discovery against the Congo, which would have allowed the Bank a fair opportunity to present all available material evidence pertinent to its opposition to the Congo's motion to dismiss or motion for summary judgment. *Cf. First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172 (2d Cir. 1998).[8]

Conclusion

---

[8] The cases relied upon by the district court and the majority to deny or limit discovery, *Arriba Ltd v. Petroleos Mexicanos*, 962 F.2d 528 (5th Cir. 1992) and *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841 (5th Cir. 2000) are inapposite because those cases dealt with issues of immunity from suit and liability under FSIA § 1605, rather than asserted immunity from execution under FSIA § 1610, as in the present case.

Although I agree with much of the majority opinion, I would reverse and remand the case for further proceedings not inconsistent with the reasons herein assigned.